United States Court of Appeals
Fifth Circuit

**F I L E D**

**March 21, 2005**

Charles R. Fulbruge III
Clerk

REVISED MAY 12, 2005

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 02-50665

_____

UNITED STATES OF AMERICA

Plaintiff - Appellee

v.

RICARDO M INFANTE

Defendant - Appellant

Appeal from the United States District Court
for the Western District of Texas, Pecos

Before KING, Chief Judge, and HIGGINBOTHAM and DAVIS, Circuit
Judges.

KING, Chief Judge:

Defendant-Appellant Ricardo Macias Infante appeals his
conviction and sentence for conspiracy to distribute and to
possess with intent to distribute marijuana, conspiracy to import
marijuana, and possession with intent to distribute marijuana.
For the following reasons, we VACATE and REMAND to the district
court for a determination on the question whether Infante's trial
counsel's conflict of interest adversely affected his
representation.

## I.  BACKGROUND

-1-

By a grand jury indictment returned on January 9, 2001, Defendant-Appellant Ricardo Infante and four co-defendants[1] were charged in a twelve-count indictment in the Pecos Division of the Western District of Texas. Only counts one, two, and ten of the indictment implicated Infante. The charges against him were: (1) conspiracy to distribute and to possess with intent to distribute more than 1,000 kilograms of marijuana in violation of 21 U.S.C. §§ 841(a)(1) and 846 (Count One); (2) conspiracy to import more than 1,000 kilograms of marijuana from Mexico to the United States in violation of 21 U.S.C. §§ 952(a), 960, and 963 (Count Two); and (3) possession with intent to distribute, or aiding and abetting the possession with intent to distribute, more than 100 kilograms but less than 1,000 kilograms of marijuana on June 29, 2000 in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Count Ten). The indictment charged Infante with participation in a conspiracy spanning from January 23, 2000 to July 14, 2000. It charged him with only a single substantive count (Count Ten), relating to a drug-trafficking incident occurring on June 29, 2000.

Infante pled not guilty to all counts on January 12, 2001. His case was tried before a jury on August 20 and 21, 2001. At

---

[1] The four co-defendants were Ramon Manuel Sanchez, Saul Montoya Salcido, Maria Teresa Zubia-Salgado, and Mayla Brenisa Polanco-Pando. Sanchez was severed prior to trial. Salcido remains a fugitive. Zubia-Salgado and Polanco-Pando both pled guilty.

trial, the government presented evidence to establish six different incidents in which members of the alleged conspiracy were apprehended while transporting marijuana from Mexico into the United States.[2]  First, the government introduced evidence that on January 23, 2000, Zubia-Salgado and Polanco-Pando were stopped at a checkpoint south of Marfa, Texas while driving a pickup truck that was found to have a hidden compartment containing 369.86 pounds of marijuana.  Neither Zubia-Salgado nor Polanco-Pando testified at Infante's trial.

Second, the government presented evidence that on January 29, 2000, Juan Gallegos-Natera was intercepted in or around Alpine, Texas while driving a pickup truck with a secret compartment containing 290.72 pounds of marijuana.  Natera testified that he was promised payment by Sanchez, whom he met through a friend, for transporting the marijuana from Mexico into Texas.  However, he stated that he had never met nor heard of Infante.

Third, the government set forth evidence that on February 26, 2000, the border patrol stopped Kristy Navarette and Lionel Campos, Salcido's nephew, while driving a Ford Bronco through the checkpoint south of Marfa, Texas.  The border patrol discovered

---

[2]  The evidence presented in relation to each incident included the testimony of border patrol agents, Drug Enforcement Agency ("DEA") agents, and immigration inspectors who were involved in the apprehension of the drug smugglers.  With the exception of one incident, the government also presented the testimony of the apprehended drug smugglers themselves.

96.52 pounds of marijuana hidden in the Bronco's gas tank. Navarette admitted that she had transported drugs across the border on a number of other occasions before being caught on February 26, 2000. She stated that she had used a Ford Bronco and a blue 1995 Chevy Suburban on those occasions. Navarette further testified that Campos, Sanchez, and Salcido were all players in the drug-trafficking operation with which she was involved, that Salcido is a known drug trafficker in the Ojinaga, Mexico area, and that she had met Polanco-Pando at some point in connection with this operation as well. However, she indicated that she never had met nor heard of Infante.

Fourth, the government presented evidence that on May 10, 2000, Benjamin Belloc was stopped at the checkpoint south of Marfa while driving a pickup truck that was discovered to have a hidden compartment containing 285.3 pounds of marijuana. Belloc admitted that Sanchez hired him to transport the marijuana into the United States and that he had smuggled drugs into the United States on at least five separate occasions. He testified that he had previously used a black truck, a red and gray Ford truck, and a blue Suburban on those occasions. He also stated that he did not know Infante and never had seen him before.

Fifth, the government introduced evidence that on June 29, 2000, the border patrol stopped Benigno Castellon while he was driving a Suburban that was found to have a secret compartment containing 715.46 pounds of marijuana. Castellon testified that

-4-

prior to being arrested for drug trafficking, he had worked at Infante's auto-mechanic shop, Infante Motors. He stated that he had gone to Mexico with Infante on or about June 18, 2000, where he met Salcido, who is Infante's brother-in-law. Castellon testified that he agreed at that time to transport his first load of marijuana (roughly forty-seven pounds) into the United States in exchange for $2,000. Castellon stated that he delivered the first marijuana load from Mexico to Infante's house. He further testified that on June 29, 2000, Infante drove him to the bus station so that he could travel to Mexico, pick up the Suburban containing a second load of marijuana, and drive it back to Texas. It was while transporting this second load that Castellon was apprehended by the authorities. The Suburban that Castellon was driving when he was arrested was confiscated. An examination of the impounded Suburban revealed that it had been freshly painted and that it was blue underneath the new coat of white paint.[3]

---

[3] The government concedes that Castellon is the only apprehended drug smuggler to implicate Infante directly. However, the government also introduced phone records showing that Infante's cell phone had been used to call certain players in the cross-border drug runs described above. For example, between April 8 and July 29, 2000, twelve calls were made from Infante's cell phone to Campos's phone. Between June 25 and June 28, 2000, roughly twenty calls were made from Sanchez's cell phone to Infante's cell phone. On June 25, 2000, five calls were made from Infante's cell phone to Sanchez's cell phone and three calls were made from Infante's cell phone to Salcido's cell phone. Between May 18 and June 28, 2000, eight calls were made from Infante's to Castellon's phone. After Castellon was arrested on June 29, Infante's cell phone was used to call the

Sixth, the government presented evidence that on July 14, 2000, Barbara Rivera-Hernandez was apprehended while driving a pickup truck between 100 and 200 yards from the US-Mexico border in Presidio, Texas. The border patrol discovered 341.24 pounds of marijuana hidden in a compartment under the floor-board of the truck. Rivera-Hernandez testified that Salcido, a known drug trafficker, had arranged for her to transport the marijuana into the United States. She also testified that she did not know Infante.

On August 21, 2001, the jury found Infante guilty of all three counts of the indictment. However, the jury found Infante guilty on the conspiracy counts with respect to only between 100 and 1,000 kilograms of marijuana, in contrast to the indictment, which charged Infante with conspiracy involving more than 1,000 kilograms. With respect to Count One, the jury expressly noted on its verdict form that it found Infante guilty only "as of June 29, 2000." The district court interpreted this note to mean that the jury found that Infante was involved only in the one transaction, which involved Castellon and occurred on June 29, 2000. Accordingly, the district court directed the probation officer assigned to Infante's case to take into consideration the amount of marijuana involved only in that single transaction when preparing the presentencing report ("PSR"). The probation

Presidio County Sheriff's Office, the Presidio County Jail, the Brewster County Sheriff's Office, and the Brewster County Jail.

-6-

officer complied with this instruction, listing 324.53 kilograms (715.46 pounds) as the amount of marijuana attributable to Infante.[4] The PSR, applying the 2001 edition of the U.S. Sentencing Guidelines Manual, recommended a base offense level of twenty-six. See U.S. SENTENCING GUIDELINES MANUAL § 2D1.1(a)(3)(c)(7) (2001).[5] The PSR also recommended an upward adjustment of two levels for obstruction of justice because Infante became a fugitive from justice after he was convicted. See U.S.S.G. § 3C1.1. The PSR gave Infante four criminal history points, putting him in a criminal history category of three. The PSR noted that the total recommended period of incarceration under the applicable Guidelines for an offense level of twenty-eight and a criminal history category of three was 97 to 121 months. As to each of the three counts, the district court sentenced Infante to 109 months of imprisonment, followed by five years of supervised release, the sentences on all counts to run concurrently.

Infante now appeals his conviction and sentence. He raises seven issues on appeal. First, Infante argues that the government presented insufficient evidence to convict him. Second, he asserts that his conviction should be reversed because

---

[4] The total amount of marijuana seized by the government in relation to the alleged conspiracy was 2,250.45 kilograms.

[5] The U.S. SENTENCING GUIDELINES MANUAL is hereinafter referred to as the "Guidelines" or "U.S.S.G."

the government failed to disclose that Castellon had been ordered to undergo a psychological evaluation to determine if he was competent to stand trial in a separate, but related, criminal case against him (for trafficking drugs on June 29, 2000 and for his involvement in the drug conspiracy). Third, Infante claims that the district court erred in denying his motion for a new trial based on newly acquired evidence that Castellon suffers from memory problems. Fourth, he claims that the district court erred by admitting evidence that he received traffic tickets for failure to change the registration on a vehicle he was driving to Mexico. Fifth, Infante asserts that the district court improperly commented on the evidence in a written response to a jury note. Sixth, he argues that he was denied effective assistance of counsel because his attorney labored under a conflict of interest. Seventh, he argues that the district court erred in enhancing his sentence for obstruction of justice. We address each of these arguments in turn.

## II. DISCUSSION

### A. Sufficiency of the Evidence

Infante asserts that the evidence presented at his trial was insufficient to sustain his conviction.[6] This court reviews a defendant's claim of insufficient evidence to determine "whether,

---

[6] Infante moved for a judgment of acquittal at the close of the government's case and at the close of all evidence.

after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Bellew, 369 F.3d 450, 452 (5th Cir. 2004) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)) (internal quotation marks omitted).  In applying this standard, we must "accept all reasonable inferences [that] tend to support the jury's verdict."  United States v. McDow, 27 F.3d 132, 135 (5th Cir. 1994).  "The evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, and the jury is free to choose among reasonable constructions of the evidence."  United States v. Dadi, 235 F.3d 945, 949-50 (5th Cir. 2000) (quoting United States v. Bermea, 30 F.3d 1539, 1551 (5th Cir. 1994)) (internal quotation marks omitted).

The jury convicted Infante of conspiracy to distribute marijuana and possess marijuana with the intent to distribute under 21 U.S.C. §§ 841(a) and 846 (Count One) and conspiracy to import marijuana under 21 U.S.C. §§ 952(a), 960, and 963 (Count Two).  To establish a conspiracy under these sections, the government must prove beyond a reasonable doubt that: (1) an agreement existed between the defendant and one or more persons to violate the applicable narcotics laws; (2) each defendant knew of the conspiracy and intended to join it; and (3) the defendant participated voluntarily in the conspiracy.  United States v.

-9-

<u>Medina</u>, 161 F.3d 867, 872 (5th Cir. 1998). An express agreement is not required; a tacit, mutual agreement with common purpose, design, and understanding will suffice. <u>United States v. Prieto-Tejas</u>, 779 F.2d 1098, 1103 (5th Cir. 1986). Moreover, because secrecy is the norm in drug conspiracies, each element of the crime may be established by circumstantial evidence. <u>United States v. Bobo</u>, 586 F.2d 355, 368 (5th Cir. 1978); <u>see also</u> <u>United States v. Espinoza-Seanez</u>, 862 F.2d 526, 537 (5th Cir. 1988).

The jury also convicted Infante of possession of marijuana with intent to distribute, including aiding and abetting such possession with intent to distribute, under 18 U.S.C. § 2 and 21 U.S.C. § 841(a) (Count Ten). To convict a defendant of possession with intent to distribute, the government must prove: (1) knowing (2) possession of an illegal substance (3) with the requisite intent to distribute. <u>See</u> <u>United States v. Garza</u>, 990 F.2d 171, 174 (5th Cir. 1993). A person who aids and abets another to commit a crime is punishable as a principal. 18 U.S.C. § 2. For the government to prove guilt under an aiding and abetting theory, it must show that the defendant: (1) associated with a criminal venture; (2) participated in the venture; and (3) sought by action to make the venture successful. <u>United States v. Lombardi</u>, 138 F.3d 559, 561 (5th Cir. 1998) (noting further that "to aid and abet, a defendant must share in the intent to commit the offense as well as play an active role

-10-

in its commission"). To be guilty of possession with intent to distribute, the defendant must have aided and abetted both the possession and the intent to distribute. United States v. Williams, 985 F.2d 749, 753 (5th Cir. 1993).

Infante claims that the evidence introduced at his trial was insufficient to allow a reasonable juror to find him guilty of these crimes beyond a reasonable doubt. We disagree. The government introduced the testimony of Castellon, which established that Castellon and Infante had traveled to Mexico together on or around June 18, 2000. According to Castellon's testimony, once in Mexico, Infante introduced Castellon to Infante's brother-in-law, Salcido. The three men then arranged for Castellon to drive a small shipment of marijuana (approximately forty-seven pounds) across the border into Texas. Castellon did so and delivered the drugs to Infante at his home. Castellon also stated that Infante discussed the arrangements for the June 29 load and that Infante drove Castellon to the bus station, where Castellon took the bus to Mexico to pick up a second load of marijuana. Castellon testified that Infante knew the drug-related purpose of the trip because the two men had discussed the plans during the preceding weeks and because Salcido had contacted Infante about the load a number of times on his cell phone. This testimony, when viewed in the light most favorable to the prosecution, sufficiently supported the jury's

-11-

verdict. See United States v. Turner, 319 F.3d 716, 721 (5th Cir. 2003), cert. denied, 538 U.S. 1017 (2003) (stating that the uncorroborated testimony of a co-conspirator can provide constitutionally sufficient evidence to sustain a conviction).

Moreover, Castellon's testimony was corroborated by the telephone toll records establishing a connection between Infante, Salcido, and Sanchez. For example, a number of calls were made between these three men's cell phones, including an increased number of calls in the days before Castellon's load of marijuana was scheduled to go across the border. In addition, a number of calls were made from Infante's cell phone to the Presidio and Brewster county jails and Sheriffs' offices on the day after Castellon was arrested. Infante maintains on appeal that no evidence proves the contents of these calls were drug related, and he further argues that the discussions theoretically could have been family or work related. Although this might be true, it does not make the jury's inference of Infante's involvement with the drug conspiracy unreasonable, especially because when Infante took the stand, he did not claim to have discussed non-drug-related matters in these calls. Instead, he denied ever making the twenty-plus calls to Sanchez (he denied knowing Sanchez at all) or the calls to the jails the day after Castellon was arrested. In fact, he maintained that he had no idea who had made any of these calls with his cell phone. The jury reasonably

-12-

disbelieved his explanation in light of the evidence that very few other people had access to Infante's cell phone. Similarly, the jury reasonably disbelieved Infante's testimony that these calls must have been made by an unknown member of the general public who broke into Infante's garage in the middle of the night and used his cell phone to call the drug traffickers. In sum, the jury discredited Infante's testimony and found his story to be unbelievable. Accordingly, the testimony of Castellon providing direct evidence, which was supported by other circumstantial evidence, sufficiently supported the jury's guilty verdict on all three counts.

**B. Disclosure of Evidence under Brady**

Next, Infante argues that his conviction should be reversed because the government violated Brady v. Maryland, 373 U.S. 83 (1963), by failing to disclose the fact that Castellon had filed a motion requesting a psychiatric evaluation of himself in connection with his own criminal trial for drug trafficking and that the district court had granted the motion and ordered the evaluation. This court reviews allegations of Brady violations de novo. United States v. Hughes, 230 F.3d 815, 819 (5th Cir. 2000). To prevail upon his Brady claim, Infante must establish that: (1) the prosecution did not disclose evidence; (2) the evidence was favorable to the defense; and (3) the evidence was material--i.e., there is a reasonable probability that if the

-13-

government had disclosed the evidence, the result of the proceeding would have been different. Lawrence v. Lensing, 42 F.3d 255, 257 (5th Cir. 1994).

Even if we assume, without deciding, that Infante has established the factors required for a Brady claim, his argument still fails. "Brady rights are not denied where the information was fully available to the defendant and his reason for not obtaining and presenting such information was his lack of reasonable diligence." United States v. Dean, 722 F.2d 92, 95 (5th Cir. 1983); accord Wilson v. Whitley, 28 F.3d 433, 435 n.3 (5th Cir. 1994) (collecting cases); Smith v. Black, 904 F.2d 950, 964 (5th Cir. 1990) (noting that Brady "exempts information that the defense could have obtained from other sources by exercising reasonable diligence"), cert. granted and vacated on other grounds, 503 U.S. 930 (1992), reinstated in relevant part on remand, 970 F.2d 1383 (5th Cir. 1992); United States v. Fogg, 652 F.2d 551, 559 (5th Cir. 1981). Here, Infante concedes that the motion seeking, and the court order granting, Castellon a psychiatric exam was part of Castellon's file for the criminal case against him for drug trafficking on June 29, 2000--the same incident that formed part of the conspiracy case against Infante. Infante does not deny that Castellon's case file was a matter of public record, that he could have obtained the file upon request, and that the psychiatric exam order would have been apparent upon

-14-

review of the file. Instead, he argues that due diligence does not require a criminal defendant or his attorney to obtain and review the court file on the government's star witness. We cannot agree, especially when the file pertains to an alleged co-conspirator and the charges against the co-conspirator are so closely related to the conspiracy with which the defendant is charged. Under these particular facts, Infante's <u>Brady</u> argument is without merit.

**C.  Motion for New Trial and Newly Discovered Evidence**

Infante also argues that the district court erred by not granting his motion for a new trial. Several months after Infante was convicted, the previously discussed psychological evaluation of Castellon was prepared in connection with the criminal case against him. Infante argues that this psychological evaluation, which disclosed that Castellon suffered from memory problems, constitutes newly discovered evidence warranting a new trial.

This court reviews the denial of a motion for new trial for an abuse of discretion. <u>United States v. Jaramillo</u>, 42 F.3d 920, 924 (5th Cir. 1995). "We disfavor these motions and view them with great caution." <u>Id.</u> We find that the district court did not abuse its discretion in denying Infante's motion. To receive a new trial under FED. R. CRIM. P. 33 for newly discovered evidence, Infante "must prove that: (1) the evidence is newly

discovered and was unknown to the defendant at the time of trial; (2) failure to detect the evidence was not due to a lack of diligence by the defendant; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material; and (5) the evidence introduced at a new trial would probably produce an acquittal." Jarmillo, 42 F.3d at 924.

The district court denied Infante's motion because it remained unconvinced that the introduction of the psychiatric report probably would have produced an acquittal. We cannot say that the court abused its discretion in denying Infante's motion because, as the district court noted, Castellon admitted on the stand that he had memory problems and that he had to write things down to remember. Thus, the jury had information that Castellon's memory was imperfect, and the defense had the opportunity to cross-examine him on that point. The jury credited Castellon's testimony when compared to Infante's conflicting testimony notwithstanding their knowledge that Castellon had a bad memory. Furthermore, Castellon's critical testimony that Infante was involved in the alleged conspiracy did not rely heavily on a memory of intricate facts such as the precise order of dates and times, and it was supported by corroborating evidence in the form of phone records. In addition, although the psychiatric evaluation placed Castellon in the below-average range in the area of immediate memory, it

placed him well within the average range for working memory.  In
light of these facts, we cannot say that the introduction of the
information contained in the psychiatric evaluation probably
would have resulted in an acquittal.  Thus, the district court
did not err in denying Infante's motion for a new trial.

**D.  404(b) Evidence**

Infante also complains that the district court erred in
admitting evidence that he received traffic tickets for driving a
Suburban without registration and for failing to change the name
on the registration.  DEA Agent Mike Hill testified at Infante's
trial that after he found the traffic tickets in Infante's home,
he questioned Infante about them.  Infante replied that he had
received the tickets in December 2000 (which is after the scope
of the conspiracy with which Infante was charged) while he was
driving a 1984 Chevy Suburban to Mexico to have it painted.[7]  The
government presented other evidence at trial that the
conspirators drove unregistered vehicles to Mexico where they had
them painted before using them to transport marijuana back into
the United States.  Infante argues that this evidence is
extrinsic to the crimes with which he was charged and that it is

---

[7]  Infante testified that he drove the Suburban to Mexico (a
full day's round trip) to have it painted there because it was
considerably less expensive than having it painted in the United
States.

inadmissible propensity evidence under FED. R. EVID. 404(b).[8]

Because Infante did not object to the admission of this evidence at trial, our review is for plain error.  See United States v. Avants, 367 F.3d 433, 443 (5th Cir. 2004), pet. for reh'g denied, 2004 WL 1335740 (5th Cir. 2004).  Under this standard, Infante "must show clear or obvious error that affects his substantial rights; if he does, this court has discretion to correct a forfeited error that seriously affects the fairness, integrity, or public reputation of judicial proceedings, but we are not required to do so."  United States v. Redd, 355 F.3d 866, 874 (5th Cir. 2003) (internal quotation marks omitted).  Infante's claim fails under this standard.

For admission under Rule 404(b), extrinsic evidence must satisfy two criteria: "(1) it must be relevant under Federal Rule of Evidence 401 to an issue other than the defendant's character; and (2) it must have probative value that substantially outweighs its prejudicial impact under Federal Rule of Evidence 403."  United States v. Walters, 351 F.3d 159, 165 (5th Cir. 2003); United States v. Beechum, 582 F.2d 898, 911-13 (5th Cir. 1978)

---

[8]  Rule 404(b) provides that:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . .

-18-

(en banc). Here, the evidence that Infante was caught driving an unregistered Suburban to Mexico where he planned to have the vehicle painted is relevant under Rule 401 to an issue other than Infante's character because it links Infante to the method used by the drug conspirators for trafficking drugs into the United States. This probative value substantially outweighed any marginal prejudicial impact that might have arisen from the information that Infante received traffic tickets for driving an unregistered vehicle. Other than connecting him to the methods used by the drug conspiracy, the evidence of his receipt of a ticket for failing to register a vehicle did not show that Infante had a propensity to commit crime or had a dishonest or otherwise unlawful character. Regardless, even if the evidence were wrongly admitted, its admission did not seriously affect the fairness, integrity, or public reputation of the judicial proceedings. Thus, reversal of Infante's conviction is not warranted on this ground.

## E. Comment on the Evidence

Infante also argues that his conviction should be reversed because the district court improperly commented on the evidence. During its deliberations, the jury wrote a note to the district court asking: "The Suburban that [Infante] was pulled over by the DPS--and rec[ei]ved a ticket for not having registration on it. Is it the same one that was confiscated?" The district court responded in writing: "There is no evidence either way." Infante

-19-

claims that this was an incorrect characterization because the evidence showed that the Suburban that Naverette admitted to having used to transport marijuana was a 1995 model, whereas the Suburban that Infante drove when he received his ticket was a 1984 model. He argues that, although he did not object at trial, the comment should be reviewed for abuse of discretion rather than plain error because the record does not show that he had an opportunity to object (i.e., it does not show that he knew the judge had received the note and intended to comment on the evidence). We need not decide the proper standard of review here, however, because Infante's argument fails under either standard.

The government points out that, although the Assistant United States Attorney ("AUSA") argued the inference that Navarette (and Belloc) had used the same vehicle as Castellon, the Suburban that was confiscated was the one Castellon was driving when he was arrested on June 29, 2000, and no evidence indicates the year of that Suburban. Thus, no evidence directly linked or refuted a possible link between the confiscated Suburban and the unregistered Suburban that Infante was driving when he received his ticket.

Infante also complains that the district court did not instruct the jury that it was not bound by his comment on the evidence. Although the district court did not specifically admonish the jury when it answered this particular question, the

court instructed the jury a number of times throughout the trial that the jury, and not the court, is the sole judge of the facts. More important, even if the district court did so err, any such error was harmless because the jury had ample evidence before it to find Infante guilty even if it had been conclusively proven that the Suburbans driven by Castellon and Infante were not the same.  See United States v. Mitchell, 166 F.3d 748, 752 (5th Cir. 1999).  Thus, the district court's comment on the evidence was not reversible error.

## F.  Conflict of Interest

Infante argues that he was denied his constitutional right to effective assistance of counsel because his attorney labored under a conflict of interest.  "Under the Sixth Amendment, if a defendant has a constitutional right to counsel, he also has a corresponding right to representation that is free from any conflict of interest."  United States v. Vaquero, 997 F.2d 78, 89 (5th Cir. 1993) (citing Wood v. Georgia, 450 U.S. 261, 271 (1981)).  Infante's trial counsel, Anthony Foster ("Attorney Foster" or "Foster"), represented two of the witnesses who testified against Infante, Gallegos-Natera and Rivera-Hernandez, in their own criminal cases.  Those cases involved Gallegos-Natera and Rivera-Hernandez's transportation of marijuana into the United States on January 29, 2000 and July 14, 2000.  Those drug-smuggling incidents were, coincidentally, the same incidents about which the witnesses testified at Infante's trial in support

-21-

of the conspiracy charges.

Before trial, the government filed a Rule 44 motion to bring Attorney Foster's potential conflict of interest to the district court's attention. The district court held a limited hearing on the matter.[9] At that hearing, the AUSA stated that he saw a potential conflict of interest but did not believe an actual conflict existed. The AUSA indicated that Foster represented Gallegos-Natera and Rivera-Hernandez previously in their own criminal cases but that neither witness knew anything about Infante or would directly implicate him in their testimony. Foster explained to the court that he had not gained any confidential information from either Gallegos-Natera or Rivera-Hernandez about Infante's case. The court asked whether these two prospective witnesses were former clients of Attorney Foster, and Foster replied that they were former clients in the sense that they had pled guilty and had been sentenced. However, Foster added that if Gallegos-Natera or Rivera-Hernandez did testify against Infante, then he would "pull [his] files and run over to the [g]overnment's office and ask for a Rule 35 [motion for a reduction in their sentences for substantial assistance in the prosecution of Infante] on [behalf of] the former clients." Notwithstanding this statement, the district court concluded that

_____

[9] Although the district judge presiding over Infante's trial was Judge W. Royal Furgeson, Jr., visiting Judge Stanwood Duval presided over the hearing relating to Infante's attorney's possible conflict of interest.

-22-

no conflict of interest existed and that there was therefore no need to go into a more extensive Garcia[10] hearing.  Accordingly, the district court did not question Infante regarding his understanding of the potential conflict of interest, and Infante did not waive his right to conflict-free representation.

As noted above, Gallegos-Natera and Rivera-Hernandez both testified against Infante at his trial, but neither one directly implicated him in the alleged conspiracy.  Attorney Foster's cross-examination of these witnesses neither disputed their testimony that their drug transportation efforts were arranged by Sanchez and Salcido nor did it contest their credibility or motive for testifying against Infante (by, for example, delving into the details of their plea agreements or their hopes of receiving a reduction in their sentences for substantial assistance).  Instead, Foster limited his cross-examination to

---

[10]  United States v. Garcia, 517 F.2d 272 (5th Cir. 1975). As we explained in United States v. Newell, 315 F.3d 510, 519-20 (5th Cir. 2002):

> After twenty-seven years the requirements of United States v. Garcia are at the hand of every trial judge in the circuit.  It commands that the district court "address each defendant personally and forthrightly advise him of the potential dangers of representation by a counsel with a conflict of interest" and detail specifics about potential conflicts that are then foreseeable.  The trial court should then seek to elicit a response from each defendant "that he understands the details of his attorney's possible conflict of interest and the potential perils of such a conflict."

(quoting Garcia, 517 F.2d at 278) (footnotes omitted).

eliciting testimony that the witnesses had no knowledge of any involvement in the conspiracy by Infante.  Infante argues that these facts demonstrate that he was denied his right to conflict-free counsel.

To prevail on his ineffective-assistance-of-counsel claim, Infante must show that his trial attorney was acting under the influence of an actual conflict of interest that adversely affected his performance at trial.  See Cuyler v. Sullivan, 446 U.S. 335 (1980); see also Strickland v. Washington, 466 U.S. 668 (1984); Perillo v. Johnson, 205 F.3d 775, 781 (5th Cir. 2000).  He need not show prejudice in the sense that the outcome of the proceeding would have been different if it were not for his attorney's conflict of interest.[11]  Perillo, 205 F.3d at 781-82 ("Assuming the defendant establishes an actual conflict that adversely affected counsel's performance, prejudice is presumed

_____

[11]  As we noted in Perillo:

The Cuyler standard applicable when a criminal defendant alleges that counsel's performance was impaired by an actual conflict of interest differs substantially from the Strickland standard generally applicable to Sixth Amendment ineffectiveness claims. Strickland requires a showing that counsel's performance was deficient, in that it fell below an objective standard of reasonableness, as well as a showing of prejudice, which is defined as a reasonable probability that counsel's error changed the result of the proceeding.  Cuyler, on the other hand, permits a defendant who raised no objection at trial to recover upon a showing that an actual conflict of interest adversely affected counsel's performance.

205 F.3d at 781 (internal citations omitted).

-24-

without any further inquiry into the effect of the actual conflict on the outcome of the defendant's trial.").  The <u>Cuyler</u> standard applies here because Infante's claim involves his attorney's conflict of interest stemming from multiple representation, rather than a conflict of interest springing "from a conflict between the attorney's personal interest and that of his client."  <u>United States v. Newell</u>, 315 F.3d 510, 516 (5th Cir. 2002) (quoting <u>Beets v. Scott</u>, 65 F.3d 1258, 1265 (5th Cir. 1995) (en banc)).[12]  The determinations whether a conflict existed and whether the conflict had an adverse effect are mixed

---

[12]  The <u>Cuyler</u> standard applies to Infante's claim notwithstanding the Supreme Court's recent decision in <u>Mickens v. Taylor</u>, 535 U.S. 162 (2002).  In <u>Mickens</u>, the Supreme Court noted that it has never extended <u>Cuyler</u> to cases of successive, as opposed to concurrent, representation, and the Court expressed concern about whether <u>Cuyler</u> or <u>Strickland</u> provides the proper standard for resolving conflict-of-interest claims involving successive representation.  <u>See Mickens</u>, 535 U.S. at 174-76.  On the facts here, however, we are reluctant to conclude that <u>Mickens</u>'s distinction between concurrent and successive representations resolves Infante's claim that Foster was laboring under an actual conflict of interest.  The representations at issue here were closely related in subject matter (all three defendants were charged with the same conspiracy) and time.  <u>See Hall v. United States</u>, 371 F.3d 969, 974 (7th Cir. 2004) (distinguishing the defendant's successive-representation claim from the <u>Mickens</u> distinction between concurrent and successive representations because the representations in <u>Hall</u> were close in time and were of closely interrelated subject matter).  Furthermore, this case is unique because Attorney Foster indicated that he would actively lobby the government to file a Rule 35 motion on behalf of Gallegos-Natera and Rivera-Hernandez if they testified against his client Infante.  Moreover, we continue to be bound by circuit precedent applying <u>Cuyler</u> to cases of successive representation.  <u>See, e.g.</u>, <u>Perillo</u>, 205 F.3d at 797-99; <u>United States v. Martinez</u>, 630 F.2d 361, 362-63 (5th Cir. 1980).

-25-

questions of law and fact, which we review de novo.  Strickland,

466 U.S. at 698; Perillo, 205 F.3d at 781.

Courts of appeals applying Cuyler traditionally have couched

its test in terms of two questions: (1) whether there was an

actual conflict of interest, as opposed to a merely potential or

hypothetical conflict; and (2) whether the actual conflict

adversely affected counsel's representation.  See, e.g., Perillo,

205 F.3d at 782; Hernandez v. Johnson, 108 F.3d 554, 559-61 (5th

Cir. 1997).  However, in Mickens, the Supreme Court announced

that "the Sullivan standard is not properly read as requiring

inquiry into actual conflict as something separate and apart from

adverse effect.  An 'actual conflict,' for Sixth Amendment

purposes, is a conflict of interest that adversely affects

counsel's performance."  Mickens, 535 U.S. at 172 n.5.

Regardless of this clarification of the terminology, the relevant

questions remain the same, and we must ask whether Attorney

Foster labored under a conflict of interest, which was not merely

hypothetical, and whether that conflict adversely affected the

representation (i.e., whether it was an actual conflict).  See

McFarland v. Yukins, 356 F.3d 688, 705-06 (6th Cir. 2004) (noting

that Mickens changed the terminology, but not the substance, of

the Cuyler test); Moss v. United States, 323 F.3d 445, 467 n.23

(6th Cir. 2003).[13]

_____

[13]  As the Sixth Circuit explained:

-26-

The district court concluded that Attorney Foster did not labor under any conflict of interest. We disagree. "A conflict [of interest] exists when defense counsel places himself in a position conducive to divided loyalties." United States v. Medina, 161 F.3d 867, 870 n.1 (1998) (quoting United States v. Carpenter, 769 F.2d 258, 263 (5th Cir. 1985)) (alteration in original) (internal quotation marks omitted); accord Mitchell v. Maggio, 679 F.2d 77, 79 (5th Cir. 1982). This question is highly fact-sensitive. See Perillo, 205 F.3d at 782, 798-99. Whether a conflict of interest exists depends on a number of factors, including, but not limited to, whether the attorney has confidential information that is helpful to one client but harmful to another; whether and how closely the subject matter of the multiple representations is related; how close in time the multiple representations are related; and whether the prior representation has been unambiguously terminated. See id. at 798-99.

Although Attorney Foster denied having learned any relevant confidential information from his former clients while

------

In Mickens, the Supreme Court clarified its prior definition of the term "actual conflict of interest" as comprising both requirements of the Sullivan test--a conflict of interest and adverse effect. . . . [I]t appears that the "actual conflict of interest" required in the first prong of the court's test requires only that the petitioner demonstrate a real or genuine, as opposed to a hypothetical, conflict of interest.

Moss, 323 F.3d at 467 n.23

representing them, the subject matter of the representations was nearly identical. Foster represented Gallegos-Natera and Rivera-Hernandez in their own criminal cases, and the crimes to which they pled guilty in those cases were part of the same alleged conspiracy with which Infante was charged. Gallegos-Natera and Rivera-Hernandez's testimony at Infante's trial consisted primarily of recounting the crimes with which they were charged in the cases in which Foster represented them. Moreover, Foster's representation of the two witnesses had not been unambiguously terminated because he admitted that he would seek a substantial assistance motion from the government for their testimony against his new client Infante. Even if Foster's representation of the witnesses was actually completed prior to Infante's trial, the representations were relatively close in time to his representation of Infante. These factors support our conclusion that a conflict of interest did in fact exist. See id. Once Gallegos-Natera and Rivera-Hernandez took the stand to testify against Infante, Foster was put in a position conducive to divided loyalties because he had to choose between vigorously cross-examining his former clients, which might jeopardize their chances of the government filing a Rule 35 motion on their behalf, and not vigorously cross-examining them, which would risk allowing the government to establish through their testimony an essential element of the case against Infante--namely, that a conspiracy existed. Cf. Perillo, 205 F.3d at 801-02 (finding,

-28-

under the particular facts of the case, that a conflict existed when an attorney cross-examined his own client as an adverse witness); Hoffman v. Leeke, 903 F.2d 280, 285-87 (4th Cir. 1990) (finding that an attorney labored under a conflict of interest when he cross-examined one client as an adverse witness in the related trial of another client); United States v. Martinez, 630 F.2d 361, 362-63 (5th Cir. 1980) (finding a conflict when an attorney previously represented a witness who testified against a current client in a related matter).  Thus, Foster labored under a conflict of interest.

However, the question remains whether this conflict of interest was an actual conflict in the sense that it adversely affected Attorney Foster's representation of Infante.  "An adverse effect on counsel's performance may be shown with evidence that counsel's judgment was actually fettered by concern over the effect of certain trial decisions on other clients." Perillo, 205 F.3d at 807 (internal quotation marks omitted).

> [W]hen a [defendant's] claim is premised solely upon what a conflicted lawyer failed to do on his or her behalf, the [defendant] must generally establish adverse effect by demonstrating that there was some plausible alternative defense strategy that could have been pursued, but was not, because of the actual conflict.

Id.  Infante argues that Foster should have pursued a strategy at trial designed to show that no drug conspiracy existed at all (which would negate an essential element of the conspiracy charges) but that he neglected to do so because of his

-29-

conflicting duty to his other clients to request that the government file a substantial assistance motion for their testimony against Infante. The government argues that the strategy that Foster pursued, i.e., questioning the witnesses only enough to show that they had no knowledge of Infante, was effective, as evidenced by the jury's finding that Infante was guilty of conspiracy only as to the June 29 load.

Although we are satisfied that the record demonstrates that a conflict on interest existed, we are not prepared to say that the record is sufficiently developed to allow us to determine whether Attorney Foster's conflict of interest adversely affected his performance. Therefore, it is necessary to vacate Infante's conviction and remand to the district court for a determination on the question whether Foster's conflict of interest adversely affected his representation of Infante. See United States v. Salado, 339 F.3d 285, 291-92 (5th Cir. 2003) (remanding to the district court on direct appeal for a determination of whether an actual conflict of interest existed and, if so, whether the conflict adversely affected the attorney's performance).

**G. Sentencing**

### 1. Application of Obstruction of Justice Enhancement

Infante argues that the district court erred in determining that his sentence should be enhanced for obstruction of justice under the Guidelines. We review the district court's factual determination that Infante obstructed justice for clear error.

United States v. Huerta, 182 F.3d 361, 364 (5th Cir. 1999).[14]  "As long as a factual finding is plausible in light of the record as a whole, it is not clearly erroneous."  Huerta, 182 F.3d at 364. We review the district court's interpretation and application of the Guidelines de novo.  Id.; see also United States v. Villegas, No. 03-21220 (5th Cir. Mar. 17, 2005).

As discussed previously, the PSR recommended the addition of two levels to Infante's offense level because Infante had become a fugitive from justice after he was convicted but before he was sentenced.  At sentencing, the probation officer further informed the court that he had made a number of attempts to contact Infante in connection with preparing the PSR but was unable to find him.  The district court asked whether Infante's absence was involuntary.  Infante's attorney replied: "No, it was just a temporary thing.  He was at the point he felt he shouldn't have to do any time because he was not guilty so he kind of wishy washed around and then finally came in."  The court responded: "Well, he didn't come in when he was supposed to come in." Accordingly, the court assessed the two additional levels under U.S.S.G. § 3C1.1, which provides that an obstruction enhancement is proper when a defendant "escape[s] or attempt[s] to escape from custody before trial or sentencing; or willfully fail[s] to

_____

[14]    Both parties agree that we review the judge's factual findings for clear error.  Accordingly, we assume without deciding that clear error is the proper standard post-Booker.

appear, as ordered, for a judicial proceeding."  U.S.S.G. § 3C1.1 cmt. 4(e).  The court's finding that Infante's failure to appear constituted obstruction of justice is plausible in light of the record as a whole and therefore is not clearly erroneous. Furthermore, its application of the Guidelines to enhance Infante's sentence because of that conduct was proper. Therefore, Infante is not entitled to relief on this ground.

### 2.  **Booker** **Error**

Infante also avers that his Sixth Amendment rights were violated under United States v. Booker, 125 S. Ct. 738 (2005), and its progeny because the district court enhanced his sentence for obstruction of justice under the mandatory sentencing regime after finding facts not admitted by the defendant or proved beyond a reasonable doubt.  Because Infante did not raise this claim in the district court below, our review is for plain error. E.g., United States v. Mares, 2005 WL 503715, at *7 (5th Cir. Mar. 4, 2005).  We find plain error when: (1) there was an error; (2) the error was clear and obvious; and (3) the error affected the defendant's substantial rights.  United States v. Olano, 507 U.S. 725, 732-37 (1993); Mares, 2005 WL 503715, at *8.  "If all three conditions are met an appellate court may then exercise its discretion to notice a forfeited error but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings."  Mares, 2005 WL 503715, at *8 (quoting United States v. Cotton, 535 U.S. 625, 631 (2002)).

-32-

Infante satisfies the first two prongs of the plain-error test because the district court committed Sixth Amendment <u>Booker</u> error and because that error is now plain after <u>Booker</u>. <u>See</u> <u>Mares</u>, 2005 WL 503715, at *8. However, he has not satisfied the third prong of the plain-error test because he cannot show that the error in question affected his substantial rights. Infante has not shown, with a probability sufficient to undermine confidence in the outcome, that if the judge had sentenced him under an advisory sentencing regime rather than a mandatory one, he would have received a lesser sentence. <u>See</u> <u>id.</u> (quoting <u>United States v. Dominquez Benitez</u>, 124 S. Ct. 2333, 2340 (2004)). The judge imposed a sentence in the middle of the properly determined Guidelines range, and there is no indication in the record from the judge's remarks or otherwise that the judge would have reached a different conclusion in an advisory regime. <u>See</u> <u>id.</u> at *9. Having failed to meet his burden, Infante is not entitled to resentencing on this ground.

### III. CONCLUSION

For the foregoing reasons, we DENY Infante's appeal on all grounds other than his claim that he was denied effective assistance of counsel. Because we find that Infante's attorney labored under a conflict of interest at Infante's trial but we cannot determine whether that conflict adversely affected Infante's representation, we VACATE the judgment of the district court and REMAND for a determination on that issue. If the

-33-

district court should find that Attorney Foster's conflict of interest did not adversely affect his performance, then it should reinstate Infante's conviction and sentence, leaving Infante free to pursue a new appeal on that ground. Any further appeal will be heard by this panel.

VACATED and REMANDED.