# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

**August 23, 2007**

Charles R. Fulbruge III
Clerk

No. 05-10428

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

CHRISTOPHER ALMAGUER,
also known as Toothpick

Defendant-Appellant

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 4:04-CR-152-2-A

Before JOLLY, STEWART, and PRADO, Circuit Judges.

PER CURIAM:[*]

Christopher Almaguer appeals his convictions on five counts related to his involvement in a methamphetamine distribution network. We AFFIRM.

## I.

Christopher Almaguer, also known as "Toothpick" was charged with six counts of illegal drug activity and money laundering in conjunction with his involvement in a drug conspiracy run by Frank Flores, otherwise known as

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

"Tank." Almaguer's case proceeded to trial, and the jury found him guilty on five counts: Count 1, conspiracy to possess with intent to distribute and to distribute more than 50 grams of methamphetamine, in violation of 21 U.S.C. § 846; Count 2, distribution of more than 50 grams of methamphetamine on April 15, 2003, in violation of 21 U.S.C. §§ 841(a)(1) & 841(b)(1)(A)(viii); Count 3, distribution of more than 50 grams of methamphetamine on January 28, 2004, in violation of 21 U.S.C. §§ 841(a)(1) & 841(b)(1)(A)(viii); Count 4, possession of two handguns in furtherance of a drug trafficking crime on April 1, 2004, in violation of 18 U.S.C. § 924(c); and Count 6, causing his common law wife, Graciela Gandara, to engage in money laundering, in violation of 18 U.S.C. §§ 2 & 1957(a).[1] Almaguer appealed his convictions on all five counts.

II.

Almaguer argues that his trial counsel provided ineffective assistance by failing to move for a judgment of acquittal on all counts at the close of the government's case, at the close of all evidence, or after the jury returned the verdict. See FED. R. CRIM. P. 29. Almaguer argues that there is insufficient evidence to support any of his convictions.

"A claim of ineffective assistance of counsel is ordinarily not reviewed on direct appeal unless it has been addressed by the district court. Only when the record is sufficiently developed with respect to such a claim, will we determine on direct appeal the merits of the claim." United States v. Rosalez-Orozco, 8 F.3d 198, 199 (5th Cir. 1993) (citations, quotation, and alteration omitted). Here, the record is sufficiently developed for us to consider Almaguer's claim, and we therefore turn to the merits of his argument.

---

[1] The jury also found Almaguer guilty of Count 5, possession of a semi-automatic rifle in furtherance of a drug trafficking crime on August 17, 2004, in violation of 18 U.S.C. § 924(c). At sentencing, however, the district court dismissed Count 5 on the government's motion.

To prevail on a claim of ineffective assistance of counsel, the defendant must demonstrate (1) deficient performance by counsel that (2) prejudiced the defense. Id. (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). "To establish prejudice, [Almaguer] must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. (quotation omitted). To determine whether Almaguer's alleged ineffective assistance of counsel prejudiced his defense, "we must evaluate the sufficiency of the evidence as if counsel had moved for judgment of acquittal at the close of the evidence." Id. at 200. "Accordingly, we must determine whether, viewing the evidence and the inferences that may be drawn from it in the light most favorable to the verdict, a rational jury could have found the essential elements of the offenses beyond a reasonable doubt." Id. (quotation omitted).

## A.

We first consider the sufficiency of the evidence for Almaguer's drug-related convictions under Counts 1, 2, 3, and 4. To convict Almaguer of drug conspiracy under Count 1, the government was required to prove beyond a reasonable doubt: (1) an agreement existed between Almaguer and one or more persons to violate the applicable narcotics laws; (2) Almaguer knew of the conspiracy and intended to join it; and (3) Almaguer participated voluntarily in the conspiracy. See United States v. Infante, 404 F.3d 376, 385 (5th Cir. 2005). "An express agreement is not required; a tacit, mutual agreement with common purpose, design, and understanding will suffice." Id. Each element may be established by circumstantial evidence. Id. Accordingly, "[a]ssociation or presence can be sufficient to prove knowing participation in the agreement if combined with other supporting circumstantial evidence." United States v. Martinez, 190 F.3d 673, 676 (5th Cir. 1999).

Similarly, to convict Almaguer of drug possession with intent to distribute under Counts 2 and 3, the government was required to prove beyond a reasonable doubt: "(1) knowing (2) possession of an illegal substance (3) with the requisite intent to distribute." See Infante, 404 F.3d at 385. "Possession can be actual or constructive, joint among defendants, and established by direct or circumstantial evidence." Martinez, 190 F.3d at 676.

Finally, to convict Almaguer of possession of a firearm in furtherance of a drug trafficking crime under Count 4, the government was required to prove that Almaguer (1) carried a firearm (2) during and in relation to a drug trafficking crime. See United States v. Guidry, 456 F.3d 493, 508 (5th Cir. 2006); 18 U.S.C. § 924(c) (2006).

Here, sufficient evidence clearly supports Almaguer's conviction under Count 2 for possession with intent to distribute on April 15, 2003. Francisco (Frank) Flores testified that a man named Fino made drug transactions on Flores's behalf and that on April 15, 2003, Fino and Almaguer delivered a shipment of methamphetamine to Jeffrey Borho. Borho likewise testified that on April 15, 2003, he arranged to purchase methamphetamine from Flores, and the shipment was delivered to him by Fino and Almaguer. Police testified that they observed Almaguer park his Lincoln Navigator at Flores's home and leave with another man and several small bags. They later observed the Navigator pull into a hotel parking lot, pick up Borho, drive around the hotel, and drop off Borho, who carried a small package. Shortly thereafter, officers stopped and arrested Borho for a traffic violation, seizing approximately 600 grams of methamphetamine. Borho also testified that a day or two prior to April 15, 2003, he was trying to get two or three pounds of methamphetamine and was waiting at a park with Flores when Almaguer pulled up in his Navigator, accompanied only by a child. Flores went to Almaguer's car window and returned to Borho soon thereafter, throwing Borho a McDonald's bag containing

french fries, catsup, and three pounds of methamphetamine. Viewing this evidence in the light most favorable to the government, see Rosalez-Orozco, 8 F.3d at 200, the evidence was sufficient for the jury to find Almaguer guilty of Count 2, see Infante, 404 F.3d at 385; Martinez, 190 F.3d at 676.

Likewise, sufficient evidence supports Almaguer's conviction under Count 3 for possession with intent to distribute on January 28, 2004. That day, police officers arrested Priscilla Pena when she was seen dumping methamphetamine out of her vehicle's window during a traffic stop. Pena testified that about one week prior to her arrest, she had called Flores and arranged to purchase "a little over a pound" of methamphetamine. She testified that Flores instructed her to meet with Almaguer to receive the methamphetamine.[2] She further testified that she met Almaguer at the designated location, and he provided her with the methamphetamine. Later, on April 1, 2004, police officers stopped Almaguer's vehicle and found $1900 in cash and two handguns. In sum, these facts provide sufficient evidence to support Almaguer's conviction under Count 3. See Infante, 404 F.3d at 385; Martinez, 190 F.3d at 676.

The foregoing facts also demonstrate, in conjunction with the record as a whole, that sufficient evidence supports Almaguer's convictions under Count 1 for drug conspiracy, see Infante, 404 F.3d at 385; Martinez, 190 F.3d at 676, and under Count 4 for possession of a handgun in furtherance of a drug trafficking crime, see Guidry, 456 F.3d at 508; 18 U.S.C. § 924(c).

B.

We next consider the sufficiency of the evidence for Almaguer's money laundering conviction under Count 6. To prove a money laundering offense under 18 U.S.C. § 1957(a), the government must prove: (1) property valued at more than $10,000 was derived from a specified unlawful activity (here, drug

---

[2] Over Almaguer's hearsay objection, the district court admitted Pena's testimony about Flores's instructions as a statement in furtherance of the conspiracy.

trafficking, see 18 U.S.C. §§ 1956(c)(7)(B)(i) & 1957(f)(3)); (2) Almaguer engaged in a monetary transaction with the property; and (3) Almaguer knew that the property was derived from unlawful activity. See United States v. Rodriguez, 278 F.3d 486, 490 (5th Cir. 2002). The term "monetary transaction" is defined to mean "the deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument (as defined in section 1956(c)(5) of this title [which includes "bank checks"]) by, through, or to a financial institution (as defined in section 1956 of this title), including any transaction that would be a financial transaction under section 1956(c)(4)(B) of this title, ..." 18 U.S.C. § 1957(f)(1) (2006).

At trial, an IRS agent testified that on April 26, 2002, Almaguer's common law wife, Graciela Gandara, entered the Forth Worth Community Credit Union with $15,100 in cash and received two cashier's checks for $7,500 each. The checks were issued to Arcadia Financial Ltd., a company based in Minneapolis, Minnesota, and the checks identified Graciela Gandara as the remitter. The agent traced the funds and determined that the $15,000 was credited in May 2002 to an Arcadia Financial account related to the purchase of a 1998 Lexus jointly owned by Almaguer and Gandara. As evidenced by Government Exhibit 7, the 1998 Lexus had been repossessed on April 16, 2002, and Gandara used the $15,000 in cashier's checks in addition to other funds to pay off the auto loan and redeem the 1998 Lexus on May 14, 2002. Furthermore, the government produced Government Exhibit 25, which summarized the transactions of a Bank of America checking account held by Almaguer and Gandara. In 2002, the deposits consisted of $36,915.00 in cash and $36,063.79 in checks, of which $1,668.06 was taken out as cash. Almaguer and Gandara filed a joint tax return for the 2002 tax year, admitted into evidence as Government Exhibit 11. On their 2002 tax return, the two of them only reported income of $24,943.00, the

amount appearing on Almaguer's W-2 tax form from his employer, Bison Building Materials.[3]

In United States v. Westbrook, 119 F.3d 1176 (5th Cir. 1997), a case of money laundering in violation of 18 U.S.C. § 1956, this Court concluded that a reasonable jury could infer that the defendant bought his Mercedes using drug money, where he did not file a tax return or identify any legitimate income and where there was "ample evidence" that the defendant was involved in extensive drug dealing. Id. at 1191. Although the facts in this case differ because Almaguer's reported income exceeded the $15,100 used for the cashier's checks, his reported salary was nevertheless only $24,943.00, and "the jury was free to discredit [Almaguer's] theory that the funds used to acquire the [cashier's checks] were from a legitimate source." See Rodriguez, 278 F.3d at 491. The record demonstrates that Almaguer and Gandara obtained over $50,000 in unexplained cash in 2002 ($36,915.00 deposited into their joint account plus $15,100 for the cashier's checks),[4] and the government produced "ample

---

[3] Almaguer points out that Gandara self-reported in a loan application in Government Exhibit 7 that her salary as of July 2001 was $2,500 per month. Nevertheless, Government Exhibit 7 also contains a letter dated July 13, 2001 from Gandara's employer stating that Gandara had been on a leave of absence since May 25, 2001, and Almaguer produced no evidence that she ever returned to work.

Almaguer also points out that Government Exhibit 8 contains a copy of a pay stub which indicates that as of October 26, 2002, Almaguer had earned $43,860.00 gross income in 2002. The pay stub clearly conflicts with his reported income and his W-2 tax form, and "viewing the evidence and the inferences that may be drawn from it in the light most favorable to the verdict," we assume that the jury believed the W-2 tax form and not the pay stub. See Rosalez-Orozco, 8 F.3d at 200.

[4] Almaguer claims that he and Gandara could have obtained the $15,100 cash from an auto insurance check they received as settlement for a wrecked Lexus. His claim is without merit. Based on a review of the couple's joint checking account, the government points out that the only check Almaguer and Gandara received from their auto insurance company was issued on November 6, 2002 as partial settlement of claims arising out of an incident on October 7, 2002, which was after Gandara obtained the cashier's checks on April 26, 2002. Furthermore, the check was only for $13,909.71.

evidence" at trial that Almaguer was involved in the drug conspiracy.  See Westbrook, 119 F.3d at 1191.  "The government is under no duty to trace the individual funds and it is not necessary that a transaction be examined wholly in isolation if the evidence tends to show that it is part of a larger scheme that is designed to conceal illegal proceeds."  Rodriguez, 278 F.3d at 491 (quotation omitted).  On the facts before us, we find sufficient evidence for a reasonable trier of fact to find beyond a reasonable doubt that the cash Gandara used to purchase the cashier's checks was derived from drug trafficking and that Almaguer knew the cash was derived from drug trafficking.  See Rodriguez, 278 F.3d at 490.

The remaining question is whether there is sufficient evidence to show that Almaguer engaged in a monetary transaction, see id., or more specifically as stated in Count 6, that he "did intentionally and knowingly cause [Gandara] to engage in a monetary transaction ...." in violation of 18 U.S.C. §§ 2 and 1957(a).  Under 18 U.S.C. § 2, "[w]hoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."  18 U.S.C. § 2(b) (2006) (emphasis added).  The record demonstrates that Almaguer and Gandara acted as common law husband and wife, shared a checking account,  owned the 1998 Lexus together, and in 2002 had over $50,000 of unexplained cash that the jury apparently concluded was mostly if not entirely Almaguer's drug money.  Under these facts, there was sufficient evidence for the jury to conclude beyond a reasonable doubt that Almaguer "caused" Gandara to engage in the monetary transaction such that he can be held liable as a principal for violating 18 U.S.C. § 1957(a).  See 18 U.S.C. §§ 2 and 1957(a).

Nonetheless, Almaguer argues that even if he "caused" Gandara to engage in money laundering, the government failed to produce sufficient evidence to satisfy the interstate commerce nexus requirement of the definition of "monetary

transaction." See 18 U.S.C. § 1957(f)(1). We disagree. Under 18 U.S.C. § 1957(f)(1), a "monetary transaction" includes "any transaction that would be a financial transaction under section 1956(c)(4)(B) of this title," and 18 U.S.C. § 1956(c)(4)(B) defines "financial transaction" as "a transaction involving the use of a financial institution which is engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree." Here, Gandara used the cash to obtain two cashier's checks made out to Arcadia Financial Ltd., a financial institution based in Minnesota but having at least one Texas address and doing business with Gandara and Almaguer in Texas, as evidenced by Government Exhibit 7. Therefore, Arcadia Financial is "a financial institution which is engaged in ... interstate or foreign commerce in any way or degree," and Gandara's payment of the cashier's checks to Arcadia Financial qualified as a "financial transaction" under 18 U.S.C. § 1956(c)(4)(B), and thus, as a "monetary transaction" under 18 U.S.C. § 1957(f)(1).

### III.

The record demonstrates that the government produced sufficient evidence for the jury to find Almaguer guilty beyond a reasonable doubt on all five counts of conviction. Therefore, he was not prejudiced by his trial counsel's failure to move for a judgment of acquittal, and his constitutional claim of ineffective assistance of counsel fails because, assuming counsel was ineffective, he cannot satisfy the prejudice prong of the claim. See Rosalez-Orozco, 8 F.3d at 199. Because we conclude that sufficient evidence supports Almaguer's convictions for the purposes of his ineffective assistance claim, which requires us to "evaluate the sufficiency of the evidence as if counsel had moved for judgment of acquittal at the close of the evidence," see Rosalez-Orozco, 8 F.3d at 200, Almaguer's stand-alone insufficient evidence claims also fail under the heightened "manifest miscarriage of justice" standard of review, see United

States v. Sam, 467 F.3d 857, 860 (5th Cir. 2006) (quotation omitted); Rosalez-Orozco, 8 F.3d at 202. Accordingly, Almaguer's convictions are

AFFIRMED.