United States Court of Appeals
Fifth Circuit

**F I L E D**

**July 18, 2006**

Charles R. Fulbruge III
Clerk

CORRECTED

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 05-50977
_____

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

DWAUN JABBAR GUIDRY,

Defendant - Appellant.
_____

Appeal from the United States District Court
for the Western District of Texas
_____

Before REAVLEY, CLEMENT, and PRADO, Circuit Judges.

EDWARD C. PRADO, Circuit Judge:

Defendant Dwaun Guidry was charged with depriving Denise Limon of her civil rights by kidnapping (Count One) and with violating her constitutional right to bodily integrity by sexually assaulting her (Count Two), both in violation of 18 U.S.C. § 242; carrying a firearm "during and in relation to" the sexual assault of Limon, in violation of 18 U.S.C. § 924(c)(1)(A) (Count Three); and conspiring to deprive five other women of their due process right to bodily integrity, in violation of 18 U.S.C. § 241 (Count Four). After trial, the jury found him guilty on all counts. On appeal, Guidry makes five arguments:

1

(1) the district court improperly admitted the testimony of Julie Ristaino accusing Guidry of extrinsic sexual assault offenses of which he was not convicted; (2) the prosecutor made remarks in his closing argument amounting to reversible error; (3) the evidence was insufficient to prove that Guidry conspired to deprive the five victims of their Fourteenth Amendment rights; (4) the evidence was insufficient to prove that Guidry carried a firearm "during and in relation to" the rape of Denise Limon, because Guidry carried a gun in his gunbelt as a matter of course; and (5) the kidnapping enhancement in 18 U.S.C. § 242 cannot be applied to Guidry because he did not transport or attempt to transport Limon across state lines. For the forthcoming reasons, we AFFIRM.

## I. FACTUAL SUMMARY

Guidry was a police officer in the small town of Balcones Heights, Texas and typically worked the night shift from 10:00 p.m. to 6:00 a.m., when often there were only two patrol officers on duty. The two incidents giving rise to the charges for which Guidry was convicted occurred while Guidry was on duty. First, he sexually assaulted five women at the Balcones Heights Police Station; and, second, he raped Denise Limon after a routine traffic stop.

### A. Sexual Assault at the Balcones Heights Police Station

The sexual assault at the Balcones Police Station gave rise

2

to Count Four, which alleged that Guidry conspired to deprive five women of their due process right to bodily integrity. Guidry and his partner Rolando Trevino arrested Denise Almodovar, Sarah Adams, Candace Ramirez, Becki Taylor, and Lindsey Valsamaki at 1:00 a.m. on November 24, 2002, when a local gas station attendant reported that the women were visibly intoxicated when they arrived in separate cars at the station. The women had each consumed over 11 alcoholic drinks that night and acknowledged they were drunk. Guidry and Trevino handcuffed the five women, placed them in their patrol car, and drove them to the Balcones Heights police station. The only other person at the police station, besides the two officers and the five women, was the dispatcher, who sat in a secure booth in a separate part of the police station. The officers followed normal booking procedure by taking the women's personal belongings, fingerprinting and photographing them, and placing them in holding cells. When the officers were photographing the women, they allowed the women to take "stupid mug shots." They also allowed the women to be in one cell together.

After a while, Guidry and Trevino led the five women out of their cell and into the patrol workroom, which is one of few rooms without video surveillance. Generally, adult arrestees are not permitted in the patrol workroom. The officers informed the women that they were not going to charge them and were going to "pretend like it never happened." Guidry ripped up the arrest

3

papers.  Guidry said, "[Y]ou are all going to be free to go, but it will take a while," and asked what the women were "going to do for" him and Trevino in return for letting them go without filing criminal charges.

Guidry pulled Becki Taylor to him and kissed her on the mouth.  At trial, Taylor testified that this advance was unwanted.  The officers told the women to dance for them and turned on the workroom radio.  The women danced.  Taylor and Adams called their friend Will Thompson, who had also been drinking with them, to pick the women up at the police station.  The officers then made sexual advances on the five women.  Trevino moved behind Candace Ramirez and reached his hand down her jeans and underwear.  Ramirez turned around to find that Trevino had unzipped his pants.  Trevino forced Ramirez's hand to touch his exposed penis.  When she resisted, he forced her head towards his penis.  Ramirez resisted and extricated herself.  She moved closer to her friend Valmasaki, who was talking to Guidry.  Guidry turned to Ramirez and forced her to kiss him.  Meanwhile, Trevino moved on to Almodovar and Adams.  Almodovar testified that Trevino shocked her by putting his hands down her pants and touching her genital area.  Adams stated that Trevino reached around from behind her and put his hand down her pants while he tried to pull his penis out of his pants.

At some point, Guidry told Valsamaki to go with him to retrieve the women's personal belongings.  Instead, Guidry led

4

her to a bathroom, where he opened the door, unzipped his pants, pulled out his penis, and attempted to force her to grab it. She resisted, and Guidry masturbated in front of her. Valsamaki testified that she did not feel she could run away because "[h]e had his gun and I was singled out. I was by myself. I didn't know what door led out. I couldn't go anywhere."

Thompson arrived to pick the women up, and the officers returned their personal belongings. Three of the women walked out of the building. Thompson later testified that the women "were pretty shocked" and that "they had tears in their eyes and they were running down their face." Taylor and Adams, meanwhile, did not want the officers to retain the photographs they took of the women and asked the officers to give them the pictures. The officers told them to "come back in here." The two returned to the patrol workroom. Guidry put Adams in a chair, undid her pants, and put his tongue on her vagina. Trevino took a picture of the event with a Polaroid camera. Trevino then did the same thing to Taylor while Guidry took a photograph. Taylor testified, "I didn't want to be in there all. . . . I just wanted to leave." The women expressed their desire to leave, and the officers led them out of the station saying, "Nobody is going to know about this." Taylor took the picture of Guidry and Adams. Taylor gave Trevino her telephone number, and testified that she was afraid if she refused the officers would take them back into the patrol room.

5

Afterward, Guidry wrote up an incident report, noting the women's detention. No criminal charges were filed against the five women. Guidry then went to see the police dispatcher, Lee Faz, to ask him what he had seen on the video surveillance that night. Faz said he did not see anything, and Guidry asked to borrow the surveillance tape. This is a departure from normal procedure, which requires that the surveillance tapes be stored in the dispatch area.

The five women filed a civil lawsuit, which they settled. Upon learning of the lawsuit, the City of Balcones Heights asked the Texas Rangers to investigate the assault. The surveillance tape, the fingerprint cards, and the mug shots were never found, except for the photo Taylor retrieved before leaving the police station, which depicted Guidry in police uniform with his head between Adams's legs. The Texas Rangers executed two federal search warrants to search for the missing evidence at Guidry's home. Guidry admitted he had destroyed the pictures (after first showing them to other officers), fingerprint cards, and arrest documentation. According to Texas Ranger Skylor Hearn, Guidry said, "Man, I don't keep trophies. When I knock someone down, I don't keep panties or pictures. . . . I am married. I don't need no pictures floating around." Although his incident report stated the women were "too intoxicated," and noted that they had "slurred" speech, he told Hearn that no charges were filed against the five women because they were "stone cold sober" when

6

they arrived at the police station.  Guidry did not deny engaging in sexual activity with the women and said it was consensual.

B. Sexual Assault of Denise Limon

The sexual assault of Denise Limon gave rise to Count One, depriving Limon of her civil rights by kidnapping; Count Two, violating her constitutional right to bodily integrity; and Count Three, carrying a firearm "during and in relation to" the sexual assault of Limon.

Approximately one month after the sexual assault at the Balcones Heights police station, Guidry raped Denise Limon.  On December 19, 2002, between 1:00 a.m. and 3:00 a.m., Denise Limon and her fiancé Ricardo Alvarez were arguing while driving home from a friend's party.  Alvarez pulled the car over, and the two got out of the car and continued arguing.  They got back in the car to continue their drive home and noticed a police vehicle was following them.  Alvarez was nervous because he had outstanding traffic warrants, did not have his driver's license, and had been drinking.  The officer signaled for Alvarez to pull over, and Alvarez complied.  When the officer approached the car, Alvarez gave him a copy of his license.  The officer looked at it and gave it back to him without further investigation.  The officer told Alvarez that he received a report of a domestic dispute and that Limon could not remain in the car.  He took Limon and put her in the back of his patrol car.  The officer told Alvarez "to go home and to wait by the phone" for Limon's phone call.

The officer drove Limon to a dark, wooded area, parked the car, unzipped his pants, pulled his penis out, and opened the driver's side back door.  He pushed Limon down, removed her pants, and raped her.  The officer wore his gun belt throughout the rape.  Limon heard the gun hitting the side of the car while the officer was raping her.  The officer stood up, turned away from her, "moaning and grabbing himself."  Limon quickly collected her clothes and ran home.  She told Alvarez and Alvarez's mother that the officer had raped her.  Limon refused to call the police that night, fearing the officer who raped her would come to her house.  The next day Limon reported the crime to the police.  The police took statements from Limon and Alvarez, and took Limon to a hospital for a sexual assault examination.  Both Limon and Alvarez described her assailant as a bald or shaved-headed black police officer with "pronounced lips."  Limon described him as weighing 200-pounds and standing 5 feet 5 inches.  Limon believed her assailant was a San Antonio police officer, and that the police vehicle had a laptop computer in it.  Laptop computers are common in San Antonio Police Department ("SAPD") cars, but not in Balcones Heights police vehicles.  Balcones Heights police vehicles do have electrical equipment other than laptop computers in them.  Based on Limon's account, the investigating officers first showed Limon a photographic line-up with SAPD officers.  Limon stated that her assailant was not in the photos.  The investigating officers

8

expanded their search to surrounding police departments and local security guards.  When the investigating officers learned that Guidry matched the physical description Limon had provided, and then learned that he had been on patrol the night of the rape, they included Guidry's photo in a second photographic line-up. Limon identified Guidry as the rapist, as part of a photographic line-up and also in the courtroom.

Guidry's police vehicle was impounded and searched by a forensic team.  They found a hair in the backseat that had similar characteristics to a hair sample taken from Limon.  They also found DNA in the backseat that matched Limon's DNA. Guidry's DNA was not found on Limon's body or clothing.  The DNA expert testified that DNA would not necessarily be found on Limon's body or clothing.

At some point, Guidry telephoned his friend Terry Moten who worked in the Sex Crimes Unit of SAPD and told him he had been charged with rape.  Guidry indicated to Moten that he had sex with Limon, but claimed it was consensual.  After Guidry's arrest, he phoned Moten to inquire if their previous conversation in which he admitted having sex with Limon was on or off the record.

## II. PROCEDURAL HISTORY

Guidry pled not guilty to all counts.  The jury trial began on January 19, 2005.  On January 21, Julie Ristaino contacted the

9

Assistant United States Attorney ("AUSA") prosecuting the case with information about Guidry. She had learned from a website that Guidry was charged with raping Limon, and an attorney had advised her to contact the United States District Court Clerk's Office in order to contact the AUSA handling the case. When Ristaino and the AUSA met, she told him that Guidry had sexually assaulted her while he was on duty.

The Government sought admission of Ristaino's testimony to show Guidry's propensity to engage in such conduct. The prosecutor called defense counsel on the day he met Ristaino, faxed a written description of her testimony to defense counsel the next day, and filed a notification and memorandum with the court on the next business day, Monday, January 24, 2005.

On January 25, the district court held a preliminary hearing outside of the jury's presence to hear from Ristaino and to determine whether to admit her testimony under either Federal Rule of Evidence 404(b) or Rule 413. The district court determined that the Government had established good cause for excusing the 15-day notice period provided by Rule 413(b). It said:

> The Court having held a preliminary hearing outside of the presence of the jury and having heard the witness's testimony finds that . . . a jury could reasonably find by a preponderance of the evidence that the other act did, indeed, occur. And that Rule 413 evidence, it is Congressional intent to allow such testimony [sic].

The district court attempted to mitigate the lack of prior

notice by requiring the Government to procure Ristaino's employment records and provide them to Guidry's defense counsel, to subpoena Ristaino's former supervisor and her ex-boyfriend for defense counsel to interview them, and to secure the timecards and attendance logs to determine if Guidry was on duty the night on which Ristaino alleged the assault took place. The prosecution complied that afternoon. The court also stated that it would permit defense counsel to recall Ristaino if there was insufficient time for investigation.

Later that day, the Government put Ristaino on the stand. She testified that during her 6:00 p.m. to 2:00 a.m. shift as a veterinary technician in Balcones Heights, Guidry had fondled her at her place of employment. After that incident, he often waited until the end of her shift at 2:00 a.m. to pull her vehicle over in traffic stops and would proceed to make sexually suggestive comments while fondling Ristaino over her clothing.

Ristaino said that, on approximately October 12, 2005, she was driving home from her shift when Guidry pulled her over in an isolated area. In uniform and badge, and carrying a gun, he entered Ristaino's car through the front passenger door and forced Ristaino to perform oral sex on him. Ristaino stated that the contact was nonconsensual, but she did not resist because she was intimidated and physically overpowered.

Immediately after her testimony, the district court gave the

11

jury an instruction limiting the consideration of Ristaino's testimony to the question of Guidry's state of mind or his intent. Meanwhile, Ristaino's employer was unsuccessful in locating a more detailed version of Ristaino's employment records. Defense counsel requested a recess to investigate further whether Ristaino's and Guidry's shifts coincided. The district court denied defense counsel's motion for a recess. Defense counsel called Ristaino's employer to the stand, who confirmed that Ristaino generally worked from 6:00 p.m. until 2:00 a.m. The district court again gave a limiting instruction regarding Ristaino's testimony, restricting the use of the evidence to the question of intent.

The jury found Guidry guilty of all four counts. A presentence report set Guidry's offense level at 43, which carries a recommended sentence of life imprisonment for Counts One and Two. The district court departed from the United States Sentencing Guidelines ("Guidelines") and sentenced Guidry to concurrent terms of 405 months imprisonment on Counts One and Two. The district court followed the Guidelines' recommendation on the other counts, and sentenced Guidry to a consecutive term of 60 months imprisonment on Count Three, and a concurrent term of 120 months imprisonment on Count Four.

### III. DISCUSSION

A. Ristaino's testimony

12

Guidry argues that the district court's admission of Ristaino's testimony leads to reversible error for three reasons. First, he contends it violated Federal Rule of Evidence 413, which he sees as limiting propensity evidence to extrinsic sexual misconduct that is the subject of a prior conviction. Second, Guidry contends that the district court's refusal to exclude Ristaino's surprise testimony alleging extrinsic sexual misconduct and its refusal to grant additional time to the defense to counter the testimony violated Federal Rule of Evidence 403 and deprived him of his right to present a defense. Third, he argues that the scope of the Government's closing remarks exceeded the limitations placed by the court on the jury's consideration of the testimony and deprived him of a fair trial.[1] Guidry claims this court should vacate his convictions and remand.

In a criminal case, we review the district court's evidentiary rulings under an abuse of discretion standard. United States v. Gutierrez-Farias, 294 F.3d 657, 662 (5th Cir. 2002) ("We review a district court's decision to admit or exclude evidence for abuse of discretion."). We review de novo a court's interpretation of law. United States v. Bell, 367 F.3d 452, 465 (5th Cir. 2004).

---

[1] This latter argument is addressed in Part III.B, infra.

13

1. <u>Application of Rule 413</u>

We have not previously examined the issues presented with regard to the application of Rule 413. Congress passed Rules 413, 414, and 415 as part of the Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 320935, 108 Stat. 1796, 2135-37 (1994).[2] Rule 413 relaxes the longstanding bar to propensity evidence restricted by Rule 404(b) and allows the admission of such evidence in trials that involve charges of sexual misconduct. <u>See</u> <u>United States v. Sioux</u>, 362 F.3d 1241, 1244 (9th Cir. 2004); <u>Johnson v. Elk Lake Sch. Dist.</u>, 283 F.3d 138, 151 (3d Cir. 2002); <u>United States v. Enjady</u>, 134 F.3d 1427, 1431 (10th Cir. 1998).

In order for evidence of "another offense of sexual assault" to be admitted under Rule 413, the district court has to determine that the act satisfied the definition provided by Rule 413(d). Federal Rule of Evidence 413 in pertinent part states:

> Evidence of Similar Crimes in Sexual Assault Cases
>
> (a) In a criminal case in which the defendant is accused of an offense of sexual assault, evidence of the defendant's commission of <u>another offense</u> or offenses of sexual assault is admissible, and may be considered for its bearing on any matter to which it is relevant.
> . . .
> (d) For purposes of this rule . . . "<u>offense</u> of sexual

---

[2] Rules 413, 414, and 415 provide exceptions to the general prohibition on character evidence in cases involving sexual assault and child molestation. Rules 413 and 414 apply to criminal proceedings, and Rule 415 applies to civil trials.

assault" means a <u>crime</u> under Federal law or the law of a
State (as defined in section 513 of title 18, United States
Code) that involved-
(1) any conduct proscribed by chapter 109A of title 18,
United States Code;
(2) contact, without consent, between any part of the
defendant's body or an object and the genitals or anus any
part of another person;
(3) contact, without consent, between the genitals or anus
of the defendant and any part of another person's body;
(4) deriving sexual pleasure or gratification from the
infliction of death, bodily injury, or physical pain on
another person; or
(5) an attempt or conspiracy to engage in conduct described
in paragraphs (1)-(4).

FED. R. EVID. 413 (emphases added).  Guidry contends that the

terms "offense" and "crime" in the statute necessarily require

conviction for admissibility.

Where a "statute's language is plain, 'the sole function of

the courts is to enforce it according to its terms.'"  <u>United</u>

<u>States v. Ron Pair Enters., Inc.</u> 489 U.S. 235, 241 (1989)

(quoting <u>Caminetti v. United States</u>, 242 U.S. 470, 485 (1917)).

"The plainness or ambiguity of statutory language is determined

by reference to the language itself, the specific context in

which that language is used, and the broader context of the

statute as a whole."  <u>Robinson v. Shell Oil Co.</u>, 519 U.S. 337,

341 (1997) (citing <u>Estate of Cowart v. Nicklos Drilling Co.</u>, 505

U.S. 469, 477 (1992)).

The plain language of Rule 413 does not support Guidry's

argument.  Black's Law Dictionary defines the term "crime" to

mean "[a] social harm that the law makes punishable."  BLACK'S

15

LAW DICTIONARY, 377 (7th ed. 1999). It defines "offense" as "[a] violation of the law," and alternatively, "a crime." <u>Id.</u> at 1108. Thus, crime and offense are interchangeable terms, to describe a harm that may be punishable by law. A conviction is not required.

Guidry argues that the phrase "commission of an offense" limits the admissible evidence to that which is proven by conviction. But "commission" is defined as the "act of doing or perpetrating." BLACK'S LAW DICTIONARY 286 (8th ed. 2004). The Rule provides no basis for limiting admissibility of evidence of the act of doing or perpetrating other sexual offenses only to those acts proven by conviction. Accordingly, the evidence of the act of doing or perpetrating an offense is admissible under the Rule.

Guidry contends that, at best, the language in Rule 413 is ambiguous. He thus argues that the rule of lenity applies and requires any ambiguity in a criminal provision to be resolved in the defendant's favor. However, his argument fails when considering the context of Rule 413. <u>See</u> <u>Shell Oil</u>, 519 U.S. at 341. The conclusion that the terms "offense" and "crime" in Rule 413 do not necessitate conviction is supported by the plain language and interpretation of Rule 404(b) to include uncharged

16

conduct.[3]  See Sioux, 362 F.3d at 1246 ("This understanding of Rule 413's plain language finds further support in the prevailing interpretation of the exceptions to Rule 404(b).").  The interpretation of Rule 404(b) and the similarity between it and Rule 413 militates against the application of the rule of lenity, because the interpretation of Rule 413 advocated by the Government is consistent with language and the history of the statute.  See Crandon v. United States, 494 U.S. 152, 160 (1990).

Even if we were unable to discern congressional intent from the plain language, the legislative history suggests Congress intended to allow admission of other uncharged sexual offenses.[4]

---

[3] Rule 404(b) provides in pertinent part,

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . ."

FED. R. EVID. Rule 404(b).

[4]  The sponsoring members of Rule 413 legislation, Senator Dole and Representative Molinari, made statements that explicitly assert that the new rule applies to uncharged conduct.

In contrast to rule 404(b)'s general prohibition against evidence of character or propensity, the new rules for sex offense cases authorize admission and consideration of evidence of an uncharged offense for its bearing "on any matter to which it is relevant." . . .

The practical effect of the new rules is to put evidence of uncharged offenses in sexual assault and child molestation cases on the same footing as other types of relevant

17

Because sexual assault allegations are often reduced to a swearing match, Congress aimed to assist the fact finder's assessment of credibility through allowing evidence of the defendant's extrinsic sexual misconduct as character or propensity evidence. See Enjady, 134 F.3d at 1431. Congress intended to expand the admissibility of character or propensity evidence relating to sexual assault by creating a broad exception to the prohibition in Rule 404(b). See Sioux, 362 F.3d at 1244; Elk Lake Sch. Dist., 283 F.3d at 151; Enjady, 134 F.3d at 1431. Rule 404(b) permits evidence of prior bad acts, including uncharged conduct, to be admitted in a criminal trial, as long as it is not used to show character or propensity. Rule 413 expands on Rule 404(b) in that it allows the admission of other sexual misconduct in order to show propensity. Consistent with its expanding on Rule 404(b), Rule 413 also allows the admission of relevant uncharged conduct. See Elk Lake Sch. Dist., 283 F.3d at 151 ("Congress intended to allow admission not only of prior convictions for sexual offenses, but also of uncharged conduct."); United States v. Withorn, 204 F.3d 790, 794 (8th Cir.

---

evidence that are not subject to a special exclusionary rule.

140 Cong. Rec. H8991 (daily ed. Aug. 21, 1994) (statement of Rep. Molinari); 140 Cong. Rec. S12990 (daily ed. Sept. 20, 1994) (statement of Sen. Dole).

2000) (finding that the district court did not abuse it discretion in allowing evidence of uncharged conduct); <u>United States v. Mann</u>, 193 F.3d 1172, 1173 (10th Cir. 1999) ("[C]ourts are to 'liberally' admit evidence of prior uncharged sex offense . . . ." (quoting <u>United States v. Meacham</u>, 115 F.3d 1488, 1492 (10th Cir. 1997) (alteration in original)); <u>United States v. Norris</u>, 428 F.3d 907, 913-14 (9th Cir. 2005) (finding evidence that defendant had also molested victim's sister was properly admitted under Rule 414). We join our sister circuits in holding that, subject to other admissibility considerations, Rule 413 allows the admission of other sexual assaults including those that are the subject of uncharged conduct.

## 2. Rule 403 balancing test

Guidry next contends that the district court erred in allowing Ristaino's testimony under Rule 403. Rule 403 states in relevant part that "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." FED. R. EVID. 403. Even if the district court preliminarily found Ristaino's evidence admissible under Rule 104(b),[5] it could have still excluded it under Rule 403.

---

[5] The text of Rule 413 is silent as to the appropriate standard for admitting evidence of past acts of sexual assault. The district court followed the Tenth Circuit in allowing Ristaino's testimony. The Tenth Circuit held that to be admissible, "the district court must make a preliminary finding that a jury could reasonably find by a preponderance of the

19

See Elk Lake Sch. Dist., 283 F.3d at 155.  A district court must apply the Rule 403 balancing test when considering the admission of evidence under Rule 413, and in the instant case, it did.

Guidry argues that the value of Ristaino's testimony is substantially outweighed by the prejudice to him because the extrinsic evidence of Ristaino's sexual assault was not the subject of a conviction.  He also claims the district court abused its discretion when it denied defense counsel's motion for recess.  With respect to Guidry's first concern, as discussed supra, Rule 413 does not require evidence of other sexual assaults to be the subject of conviction.  As to Guidry's second concern, the district court indicated it applied Rule 403 balancing when it mitigated the prejudicial effects of allowing Ristaino's testimony without the notice otherwise required by Rule 413(b).

Despite the relevance of Ristaino's testimony,[6] Guidry

---

evidence that the [extrinsic sexual misconduct] occurred."
Enjady, 134 F.3d at 1433.  The Third Circuit similarly has used this standard for screening uncharged conduct.  Elk Lake Sch. Dist., 283 F.3d at 152-53.  Citing to Huddleston v. United States, 485 U.S. 681 (1988), the Third Circuit concluded that Huddleston's standard for screening uncharged conduct applies to Rule 413, because of the similarity between Rules 404(b) and 413. Elk Lake Sch. Dist., 283 F.3d at 152-55.

[6] The district court's decision to admit Ristaino's testimony was sound when considering the similarity between her testimony and the charged conduct.  See United States v. Carter, 410 F.3d 1017, 1022 (8th Cir. 2005) (upholding the admission evidence of other sexual assaults where there were similarities

20

emphasizes that he received no pretrial notice, and, therefore,

her testimony's relevance is substantially outweighed by the

prejudice to him.  While Rule 413(b) generally requires fifteen

days notice, the district court has discretion where there is

good cause.  Rule 413(b) reads:

> In a case in which the Government intends to offer evidence
> under this rule, the attorney for the Government shall
> disclose the evidence to the defendant, including statements
> of witnesses or a summary of the substance of any testimony
> that is expected to be offered, at least fifteen days before
> the scheduled date of trial or at such later time as the
> court may allow for good cause.

FED. R. EVID. 413(b).  The Government had good cause for not

providing pretrial notice.  It did not learn of Ristaino's

testimony until after the trial had already started.  The

Government alerted defense counsel to Ristaino's testimony on the

same day it learned of it and faxed the content of the testimony

the next day.  In fact, defense counsel had at least three days

---

between the incidents); <u>Elk Lake Sch. Dist.</u>, 283 F.3d at 156
(noting the probative value of past acts that are "sufficiently
similar to the type of sexual assault allegedly committed by the
defendant"); <u>Mann</u>, 193 F.3d at 1174 ("Uncharged prior sexual acts
are probative if they are similar to the charged crimes.").  The
similarities between Guidry's conduct toward Ristaino and the
charged offenses heightens the probative value of her testimony
because in all three instances Guidry used his official position
and its accoutrements, including his police car, his badge, and
his gun, to apprehend women during his night shift, isolate them,
and then force them to perform sexual acts with him.  In
addition, Ristaino's testimony indicates that she was sexually
assaulted within two months of Guidry's sexual assault of the
five women at the police station.  The close temporality of the
instances further heightens the probative value of Ristaino's
testimony.

to prepare before the hearing on the matter. In response to defense counsel's concerns that Rule 403 balancing in favor of admission was compromised by the late notice given to defense counsel, the district court said:

> But the relevance I do find . . . is although there are some factual dissimilarities between the events, there is enough similarity in other respects that I am going to allow this in. Now, let me try to cure what other defects may arise here. We are going to proceed today. We are not going to take a recess yet. This witness will go on. [Defense counsel] will have the opportunity to cross-examine this witness. In the interim, the government is going to do the following. [The Government is] to procure Ms. Ristaino's employment records today. . . . [The Government is] also to make available [the individuals in whom Ristaino confided]. [Defense counsel] . . . will be able to recall [Ristaino] after you have had a chance to do the investigation that I am allowing you. . . . The government is ordered to secure all of the timecards or attendance logs . . . that would show when this defendant was working during the entire month of October 2002.

In deciding not to allow a recess, the district court said:

> The Court has attempted to make every effort to provide an opportunity for discovery, albeit late notice to the defense. The Court further finds that if additional time was given to the defense, specifically to analyze payroll work records of Ms. Ristaino, that such opportunity would not lead to any meaningful or fruitful evidence.

Thus, the district court mitigated the prejudicial effect of admitting Ristaino's testimony with no pretrial notice by giving defense counsel the opportunity to interview Ristaino, her employer, her ex-boyfriend, and to review documentary evidence relating to Ristaino's work schedule as compared to Guidry's dispatch log. The district court did not abuse its discretion in

22

allowing Ristaino's testimony without allowing for a recess.

B.   Remarks made in prosecution's closing statement

Guidry argues that the prosecutor's closing statement amounts to prosecutorial misconduct and reversible error, requiring this Court to vacate his convictions and remand. Because Guidry failed to make a timely objection at trial, we apply plain error review. United States v. Gallardo-Trapero, 185 F.3d 307, 322 (5th Cir. 1999).

Even if Guidry had made a timely objection, his burden of establishing that an allegedly improper remark by the prosecutor is substantial. United States v. Mares, 402 F.3d 511, 515 (5th Cir. 2005) (citing United States v. Virgen-Moreno, 265 F.3d 276, 290 (5th Cir. 2001)). "The determinative question in such an inquiry is 'whether the prosecutor's remarks cast serious doubt on the correctness of the jury's verdict.'" Id. (quoting Virgen-Moreno, 265 F.3d at 290). "Inappropriate prosecutorial comments, standing alone, would not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding." United States v. Young, 470 U.S. 1, 11 (1985). In reviewing the possibility of reversible error, we consider "(1) the magnitude of the prejudicial effect of the prosecutor's remarks, (2) the efficacy of any cautionary instruction by the judge, and (3) the strength of the evidence supporting the conviction." United States v. Palmer, 37 F.3d 1080, 1085 (5th Cir. 1994).

23

It is undisputed that the district court at least twice instructed the jury to consider Ristaino's testimony only for state of mind or intent, even though Rule 413 does allow such testimony to be used for propensity purposes. Guidry argues that some of the prosecutor's references to Ristaino and her testimony went beyond state of mind or intent by characterizing her as another victim. Guidry recounts that at the end of the second prosecutor's closing statement, he urged the jury to "remember the victims in this case, Denise Limon, Becki Taylor, Denise Almodovar, Candace Ramirez, Lindsey Valsamaki, Sarah Adams, and I hope you remember Julie Ristaino." Similarly, earlier, the prosecutor said,

> It was our badge, and he defiled it and he violated it, just like he violated his victims. He used that badge to find victims. He found known targets, like poor Julie Ristaino.

Guidry fails to demonstrate plain error because these remarks alone do not justify reversing the jury verdict. See Young, 470 U.S. at 11. The prosecutor may have named Ristaino as a victim, but this does not amount to an appeal to the jury to punish Guidry for the sexual assault of Ristaino. Rather, he was generally describing Ristaino as one of the victims of Guidry's sexual assaults. In light of the "wide latitude" given to counsel in presenting closing argument, the degree to which these remarks could be characterized as improper in view of the limiting instructions the district court gave the jury and the

24

substantial evidence supporting conviction on all counts, the prosecutor's statements do not amount to reversible error.  See United States v. Holmes, 406 F.3d 337, 356 (5th Cir. 2005); United States v. Hernandez-Guevara, 162 F.3d 863, 874 (5th Cir. 1998).

Because Guidry's arguments do not cast doubt on the correctness of the jury's verdict, we find that the prosecutor's closing remarks, even if arguably improper, were not so prejudicial as to constitute plain error.

C.  Sufficiency of the evidence under 18 U.S.C. § 241

Guidry maintains that the Government failed to meets its burden as to the elements in 18 U.S.C. § 241 because of insufficiency of evidence.[7]  Guidry contends that his and Trevino's misconduct did not rise to the level of a constitutional deprivation.  Guidry argues that there was no showing that the officers used force or intimidation, nor that their actions shock the conscience.  Thus, he claims that Count Four should be vacated, the charge dismissed, and his case remanded for resentencing.

We review an insufficiency of the evidence claim by

---

[7] We recognize that Guidry disputes that substantive due process includes the right to be free from sexual assault.  He acknowledges that this claim is foreclosed by Doe v. Taylor Independent School District, 15 F.3d 443, 450-52 (5th Cir. 1994) (en banc), but preserves the issue for further review.

25

inquiring "whether, after viewing the evidence in the light most favorable to the prosecution, _any_ rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); United States v. Jones, 693 F.2d 343, 345-46 (5th Cir. 1982). "This standard of review applies to any criminal conviction, including conspiracies." United States v. Davila, 704 F.2d 749, 751 (5th Cir. 1983). "[U]nder Jackson, the assessment of the credibility of witnesses is generally beyond the scope of review." Schlup v. Delo, 513 U.S. 298, 330 (1995). We review questions of constitutional law de novo. United States v. Romero-Cruz, 201 F.3d 374, 377 (5th Cir. 2000).

The district court used the Fourteenth Amendment to frame its instruction to the jury regarding Count Four, whether Guidry deprived the five victims "of the right to be free from the deprivation of liberty without due process of law, including the right to bodily integrity."[8] Government officers violate

---

[8] As the Government points out, this civil rights violation may have been more appropriately analyzed using the Fourth Amendment, because the five women were in the custody of the Balcones Heights police officers when the violation occurred. The Fourth Amendment standard balances the nature and quality of the intrusion against the importance of the Government interest justifying the intrusion. Brothers v. Klevenhagen, 28 F.3d 452, 455 (5th Cir. 1994). Because the Fourteenth Amendment requires a heightened inquiry (the "shock the conscience" standard) than the Fourth Amendment, the satisfaction of the Fourteenth Amendment standard should satisfy the Fourth Amendment standard.

26

another's substantive due process rights when their actions "can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense." Collins v. City of Harker Heights, 503 U.S. 115, 128 (1992).

Guidry's conviction for Count Four, under 18 U.S.C. § 241, stands if, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the following elements beyond a reasonable doubt: that Guidry and Trevino 1) conspired to injure, oppress, threaten, or intimidate one or more of the victims, 2) with the intent to interfere with the victim's due process rights, 3) under color of state law. 18 U.S.C. § 241. See also United States v. Vaden, 912 F.2d 780, 781 (5th Cir. 1990) ("To convict . . . , the government had to prove that while acting under color of state law [the defendant] conspired with others to deprive [the victim] of a right guaranteed him by the Constitution or law of the United States.")

The facts in this case support the finding that a rational trier of fact could have found, beyond a reasonable doubt, that Guidry and Trevino conspired to intimidate the five intoxicated women when they took the women into custody, then led the women to a room in the police station beyond the reach of video surveillance, where the officers expressed their willingness to forego criminal charges while asking, "what will you do for us?" The fact that Guidry and Trevino were on duty, in police uniform,

27

wearing their badges and carrying their weapons when they took the women into custody and booked them would be enough for a jury to find that the officers used their positions of power to, at the very least, intimidate, and at the most, force the five women to engage in non-consensual sexual conduct.  In addition, the officers handcuffed and booked the women, took their personal belongings, fingerprinted and photographed them.  Even considering that at first, when the officers were booking the women, there was a sense of joviality when the women posed for "silly mug shots," a jury could find that the atmosphere changed when the women were led to an isolated room where the officers essentially bartered for the women's freedom and made sexual advances toward them.  This conclusion stands even considering Guidry's argument that he and Trevino did not make sexual advances towards the women until after they were free to go.  A jury could find that the women were intimidated by Guidry's and Trevino's official power such that they did not feel free to leave, especially because Guidry and Trevino still had control over the women's belongings when they purport the women were free to leave and explicitly said to them that "it would take a while" before they were free to leave.  A jury could reasonably conclude that Guidry's behavior "shocks the conscience."

We find the evidence sufficient to prove that Guidry conspired to deprive the five victims of their Fourteenth

28

Amendment rights.

D.  Sufficiency of the evidence under 18 U.S.C. § 924(c)

Guidry contends that the Government failed to meet its burden in showing that he carried a firearm in relation to the deprivation of due process and aggravated sexual abuse of Denise Limon.  He maintains that the only evidence of a gun was hearsay, when a detective who interviewed Limon testified that Limon told her she heard the gun banging on the side of the car during the rape.  Guidry argues that the hearsay statement suffices to show that Guidry carried a firearm during the offense, but fails to show that it was carried "in relation to" the offense.  As the argument goes, as a police officer, Guidry must carry his gun, and it was merely present when he raped Limon.  In fact, Guidry further argues that Limon said she did not resist Guidry because she was physically overpowered rather than explicitly threatened by Guidry when he raped her.  The logical inference, as the argument continues, is that Guidry's gun was not used to facilitate the crime.  Guidry claims the conviction and consecutive five-year sentence for Count Three must be vacated.

Section 924(c)(1)(A) of Title 18 of the United States Code states in relevant part:

> [A]ny person who, during and in relation to any crime of violence or drug trafficking crime . . . for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the

29

> punishment provided for such crime of violence or drug trafficking crime-
> (i) be sentenced to a term of imprisonment of not less than 5 years; . . . .

18 U.S.C. § 924(c)(1)(A)(i). To prove a violation of § 924(c)(1), the Government must prove two elements beyond a reasonable doubt: First, it must demonstrate that the defendant carried a gun. Second, it must prove that the carrying was during and in relation to a crime of violence or drug trafficking crime. United States v. Polk, 118 F.3d 286, 293 (5th Cir. 1997).

It is undisputed that Guidry carried the gun on his gunbelt during the rape of Denise Limon. The parties contest only the second prong. To be carried "in relation to" an offense under this section, a gun must have "some 'purpose or effect' with respect to the crime of violence." Id. (quoting Smith v. United States, 508 U.S. 223, 237-38 (1993)). Yet, the Supreme Court in Smith recognized that the phrase "in relation to" is expansive. Id. (citing Smith, 508 U.S. at 237-38). The firearm must "'facilitate or have the potential of facilitating'" a crime of violence for § 924(c)(1) liability to attach. Id. (quoting Smith, 508 U.S. at 238).

Guidry's argument fails in light of the analogous case United States v. Contreras, 950 F.2d 232 (5th Cir. 1991). There, this Court upheld a police officer's § 924(c) conviction where the on-duty police officer drove a female arrestee to a dark,

30

isolated location, and sexually assaulted her.  Id. at 242.  This

Court said:

> The government does not have to show, however, that a
> defendant actually used or brandished the firearm to prove
> "use" within the meaning of section 924(c). . . . [I]f the
> evidence shows that the "firearm facilitated or had a role
> in the crime, such as emboldening an actor who had the
> opportunity or ability to display or discharge the weapon to
> protect himself or intimidate others," the defendant "used"
> the weapon regardless of whether such display or discharge
> occurred.

Id. at 241 (quoting United States v. Coburn, 876 F.2d 372, 375

(5th Cir. 1989)).  Even though the defendant police officer

routinely carried a firearm as part of his job, and he took off

his gunbelt and put it on the roof of the car during the assault,

this Court found that a jury could have reasonably concluded that

he was emboldened by his possession of the gun to assault his

victim, that he displayed the gun in order to intimidate the

victim, and that he had the opportunity and ability to discharge

the gun throughout the sexual assault.  Id. at 242.  Thus, the

firearm played a sufficient role in facilitating the defendant's

crime to support his § 924(c) conviction.  Id.

As in Contreras, Guidry did not take his gun out of his belt

and actually threaten his victim, but he did keep his belt on

such that Limon heard his gun banging against the side of the car

while he was raping her.  Guidry's gun remained holstered during

the rape, but was always within his reach.  A jury could

reasonably conclude that Guidry was emboldened by his possession

31

of the gun to rape Limon, and that the gun was a threat to and intimidated Limon.

We find the evidence sufficient to prove that Guidry carried a firearm "during and in relation to" the rape of Denise Limon, in violation of 18 U.S.C. § 924(c).

E.  Kidnapping enhancement under 18 U.S.C. § 242

Guidry argues the Government failed to prove under the instant facts that Guidry qualified for the sentence enhancement for kidnapping in 18 U.S.C. § 242.  He contends that in the absence of a definition of "kidnap" in § 242, this Court must rely on the "common law" definition of "kidnap," which he contends requires proof that a victim was carried out of state or out of the country to constitute kidnapping.  Guidry states that there is no evidence that Congress intended differently from this common law meaning of "kidnapping."  Thus, he claims his sentence on Count One must be reduced to the ten-year maximum applicable to the lesser-included offense that does not involve kidnapping.

Section 242 of Title 18 of the United States Code states:

Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States . . . ; and . . . if such acts include kidnapping or an attempt to kidnap . . . shall be fined under this title, or imprisoned for any term of years or for life, or both, or may be sentenced to death.

18 U.S.C. § 242.

32

Although the statute does not define "kidnapping" or "kidnap," and there are no cases that define these terms in this statute's context, Guidry's reliance on the common law definition of "kidnap" is misplaced.  We do not use the common law definition of any term where it would be inconsistent with the statute's purpose, notably where the term's definition has evolved.  See, e.g., Moskal v. United States, 498 U.S. 103, 116-17 (1990) (rejecting the common law definition for the term "falsely made," used in 18 U.S.C. § 2314, because "Congress' general purpose in enacting a law may prevail over this rule of statutory construction, [i.e., the common-law meaning rule]"); Taylor v. United States, 495 U.S. 575, 592-96 (1990) (refusing to find that the term "burglary" in a sentencing enhancement statute was limited to the common law meaning of the terms, which would have required entry into a dwelling place in the nighttime); Perrin v. United States, 444 U.S. 37, 45 (1979) (defining the term "bribery" in 18 U.S.C. § 1952 based on the contemporary understanding of the term because the common law definition had evolved and now the term included the bribery of individuals acting in private capacity).  "Taylor instructs that where, as here, the enhancement provision does not specifically define the enumerated offense, we must define it according to its 'generic, contemporary meaning' and should rely on a uniform definition. . . ."  United States v. Dominguez-Ochoa, 386 F.3d 639, 642-43 (5th

33

Cir. 2004) (internal citation omitted).  Following Taylor's lead,

we look at other sources of authority for the definition of

"kidnapping":

> Under the common law definition of kidnapping, asportation
> was an essential element . . . . Under modern statutes, by
> comparison, asportation is most often treated as an
> alternative element, in that either asportation or
> confinement will suffice as the actus reus of the crime . .
> . .

3 WAYNE R. LAFAVE, SUBSTANTIVE CRIMINAL LAW § 18.1, at 4 (2d ed.

2003).  Indeed, the Taylor Court's assessment with regard to the

term "burglary" in a sentencing enhancing statute holds true for

the term "kidnapping" in the instant statute: "[C]onstruing

'[kidnapping]' to mean common-law [kidnapping] would come close

to nullifying that term's effect in the statute, because few of

the crimes now generally recognized as [kidnapping] would fall

within the common-law definition."  Taylor, 495 U.S. at 594.

Guidry's argument fails.

Guidry also claims that the terms "kidnapping" and "kidnap"

should adopt the definition of the terms in the federal

kidnapping statute, 18 U.S.C. § 1201, which would require

interstate abduction.  In that case, Guidry argues his conduct

did not meet the elements of kidnapping for purposes of this

statute.  He contests the district court's reliance on United

States v. Combs, 33 F.3d 667 (6th Cir. 1994), in which the

defendant had been charged with both the federal kidnapping

34

statute as well as the deprivation of civil rights under § 242 through kidnapping.

In <u>Combs</u>, a previous version of § 242 existed that did not include an explicit kidnapping enhancement. The Government charged the defendant under this statute with depriving the victim's civil rights by the means of kidnapping. The lower court had defined "kidnapping" for purposes of § 242 as "an act in which an individual forcibly holds, detains, or carries away an alleged victim against his will." <u>Id.</u> at 668. <u>Combs</u> held that an acquittal of a federal kidnapping charge did not require acquittal of a § 242 charge that also alleged kidnapping. <u>Id.</u> at 670. Guidry argues that <u>Combs</u> is inapposite given that the current version of § 242 explicitly refers to kidnapping and therefore must adopt the definition of kidnapping in the federal sentencing statute, which requires interstate abduction. If Guidry is correct, then, for the purposes of § 242, the term "kidnapping" would have to meet the elements of the term as it is defined in the federal sentencing statute. "To prove a charge under 18 U.S.C. § 1201, the government must prove four elements: (1) the transportation in interstate commerce (2) of an unconsenting person who is (3) held for ransom or reward or otherwise, (4) [with] such acts being done knowingly and willfully." <u>United States v. Barton</u>, 257 F.3d 433, 439 (5th Cir. 2001).

35

However, Guidry's argument that the federal kidnapping statute should define the elements for "kidnapping" under 18 U.S.C. § 242 is misplaced. If Guidry were charged with violating the federal kidnapping statute when he took Limon to an isolated spot in order to sexually assault her, for the purpose of federal jurisdiction he indeed would have had to transport Limon out of the state. But here, Guidry was charged with violating Limon's civil rights by kidnapping her. Federal jurisdiction exists without interstate abduction because his action constituted a violation of Limon's constitutional rights. In the absence of § 242 requiring "kidnapping" to comport with the elements of the federal kidnapping statute, the generic, contemporary meaning of kidnapping statute suffices.

We hold that Guidry did not need to transport or attempt to transport Limon across state lines in order to qualify for the sentencing enhancement for kidnapping under 18 U.S.C. § 242. We conclude that because Guidry drove Limon to a secluded area, he intentionally abducted and confined Limon without her consent, and thus his conduct comes under 18 U.S.C. § 242. Under this analysis, a jury could have reasonably concluded that Guidry deprived Limon of her civil rights by kidnapping her, supporting the sentencing enhancement.

## IV. CONCLUSION

We AFFIRM Guidry's conviction on all four counts.

36