**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
**File Name: 14a0153n.06**

**No. 12-6164**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

Feb 26, 2014

DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR THE |
| | ) | EASTERN DISTRICT OF KENTUCKY |
| | ) | |
| MICHAEL FRED PENNINGTON, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |

Before:  DAUGHTREY, COLE, and WHITE, Circuit Judges.

MARTHA CRAIG DAUGHTREY, Circuit Judge.  After pleading guilty to one count of possession of hydrocodone with intent to distribute and one count of distribution of hydrocodone, defendant Michael Fred Pennington proceeded to trial on a charge that he "knowingly used and carried a firearm" during and in relation to the illegal hydrocodone distribution.  *See* 18 U.S.C. § 924(c)(1)(A).  The jury found Pennington guilty of the firearm offense, and the district court imposed an effective 74-month prison term – 14 months on each of the drug offenses (to be served concurrently) and a consecutive 60-month sentence for the firearm transgression.

Pennington appeals, arguing:  (1) that the evidence adduced at trial was insufficient to support the firearm conviction under section 924(c)(1); (2) that the prosecutor's closing argument to the jury both improperly served to shift the burden of proof from the government to him and

misstated the applicable law; and (3) that the district court's instructions broadened the basis for the conviction and thus constituted a constructive amendment of the indictment. We conclude that, under the somewhat unusual circumstances of this case, the trial evidence was insufficient to support Pennington's firearm conviction. We therefore vacate the judgment of conviction in part and remand the matter to the district court for resentencing on the two drug offenses to which Pennington pleaded guilty.

## FACTUAL AND PROCEDURAL BACKGROUND

The charges against Pennington arose from a visit by social worker Stacey Adkins to the home of Danny and Regina West to investigate the reported abuse of one of the Wests' three children. Because such investigations pose the threat of violence and may result in the need to remove a child from the home, Adkins requested accompaniment by a Kentucky state trooper. The defendant was assigned to the task and, while attired in his official uniform and carrying his service weapon in its holster, he knocked on the door of the West residence and, along with Adkins, was allowed to enter. Adkins spoke initially with Regina West, and defendant Pennington proceeded to one of the bedrooms to rouse Regina's husband, Danny, who was sleeping. Then, while Adkins later questioned Danny West in the living room, Pennington retreated with Regina West into the bedroom. In that room, the defendant noticed that a Lortab pill had been crushed and had been laid out in a line on a piece of furniture in the room. Despite the fact that Lortab contains hydrocodone, a Schedule III controlled substance, Pennington told Regina that she could snort the line of hydrocodone without fear that he would arrest her for doing so.

Pennington also found a silver container in the room containing six additional Lortab pills. Rather than cataloguing his find, Pennington simply placed the container in his own pocket and told Regina that "he'll let it all go away if" she would "have sex with him." He then convinced Regina to give him her cell phone number before driving her to pick up her children from the school-bus stop. Although the social worker "thought it was a little odd" that Pennington would drive Regina to the bus stop, Regina herself testified that the defendant accompanied her "so [she] wouldn't coach [her children] into telling the social worker something different." On the way back to the West home from the bus stop, and even though two of the West children were in the back seat of Pennington's cruiser, the defendant asked Regina whether she would "[s]nort a pill off his dick."

Regina did not respond, and Pennington left the area after dropping off her and her children and being told by Stacey Adkins that his assistance was no longer needed. At the suggestion of the social worker, however, Regina West was given a ride to the local hospital by her sister and cousin so that the child who was the subject of the child-abuse complaint could be examined by a physician. Then, at approximately 8:00 p.m., while West was still at the hospital, Pennington called her cell phone and asked to meet with her at her home. With her sister listening in on the conversation, Regina told the defendant that she was at the hospital, to which Pennington replied that "his next available time was at 3 a.m.," or approximately seven hours later.

Fearing for her sibling's safety, Regina's sister contacted the Williamsburg (Kentucky) chief of police, with whom she was familiar. In turn, that official contacted Sergeant Stephen Walker of the Kentucky State Police, who obtained Regina West's consent to have audio/visual surveillance

- 3 -

equipment set up in her home. Pennington called Regina's cell phone at 3:38 a.m. to say that he would be at the West residence in approximately ten minutes. By that time, Walker and Sergeant Tracy Woods had already hidden a video camera in the home's living room and had secreted themselves in a bedroom where they could not be seen by Pennington.

When the defendant arrived at Regina West's home at 3:48 a.m., he was dressed in his state trooper's uniform and armed with his service weapon. Upon entering the dwelling, Pennington immediately handed West one of the Lortabs he had previously confiscated from her. West then asked Pennington if her acquiescence to his untoward advances would ensure that she would not be arrested, and he assured her that she would not go to jail on the drug charges if she acceded to his sexual requests. He then asked West what she wanted to do, and she responded by asking Pennington what *he* wanted to do. When the defendant answered, "Do you want to suck this thing?" Sergeants Woods and Walker emerged from their hiding place, disarmed Pennington, and took him into custody. A subsequent search of the defendant's patrol car uncovered Regina West's metal container, now holding seven pills, in the center console cup holder of the vehicle. Laboratory analysis of those pills indicated that five of them contained hydrocodone, a Schedule III controlled substance; one pill contained Diazepam, a Schedule IV controlled substance; and one pill contained oxycodone, a Schedule II controlled substance.

A federal grand jury returned a three-count indictment against Pennington, charging him in Count 1 with possession with intent to distribute hydrocodone, in Count 2 with the distribution of hydrocodone to West, and in Count 3 with using and carrying a firearm "during and in relation to

the drug trafficking crime set out in Count 2." The defendant entered guilty pleas to the two drug charges, but insisted on going to trial on the weapons charge. After a two-day trial, the jury found Pennington guilty on Count 3 as well. The district court then imposed concurrent 14-month sentences for the drug offenses and a consecutive 60-month prison term for carrying a firearm during and in relation to the distribution of the hydrocodone tablet. Pennington raises three issues on appeal related to his conviction on the firearm charge, the determinative one alleging that the evidence adduced at trial was insufficient to support the § 924(c)(1) conviction.

### DISCUSSION

In determining the sufficiency of the evidence to support a guilty verdict, the reviewing court examines "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). When engaged in such review, "[w]e do not insert our own findings of fact; rather, we give full credit to the responsibility of the jury to weigh the evidence, to make credibility determinations, and to draw inferences." *United States v. Washington*, 715 F.3d 975, 979 (6th Cir. 2013) (citing *Jackson*, 443 U.S. at 319).

To determine the validity of Pennington's claim that no rational trier of fact could have concluded beyond a reasonable doubt that he was carrying his service weapon "during and in relation to" the offense of distributing the Lortab pill to Regina West, we first examine the relevant

language of the statutory provision at play and federal courts' interpretations of that language. In pertinent part, 18 U.S.C. § 924(c)(1)(A)(i) states that "any person who, during and in relation to any crime of violence or drug trafficking offense . . . for which the person may be prosecuted in a court of the United States, uses or carries a firearm . . . shall . . . be sentenced to a term of imprisonment of not less than 5 years." Thus, for purposes of this case, Pennington's section 924(c)(1) conviction can stand only if the government can establish both that the defendant "carried" a firearm *and* that the weapon was "carried" "during and in relation to" the drug trafficking offense outlined in Count 3 of the indictment. *See generally United States v. Guidry*, 456 F.3d 493, 508 (5th Cir. 2006).

"A defendant carries a firearm when he conveys or moves the firearm . . . and when there is 'personal agency and some degree of possession' over the firearm." *United States v. Gibbs*, 182 F.3d 408, 426 (6th Cir. 1999) (quoting *Muscarello v. United States*, 524 U.S. 125, 134 (1998)). However, "the firearm need not be immediately available for use and . . . 'the proper inquiry [in determining whether a firearm is being "carried"] is physical transportation' of the firearm." *United States v. Combs*, 369 F.3d 925, 933 (6th Cir. 2004) (quoting *Hilliard v. United States*, 157 F.3d 444, 449 (6th Cir. 1998)). Pennington does not contest the fact, that he "carried" a firearm into Regina West's home on the night in question. Our inquiry is thus focused on whether that "carrying" was "during and in relation to" a drug-trafficking offense.

"To establish that a firearm was carried *'in relation to' a drug trafficking offense*, the evidence must support a finding that the firearm furthered the purpose or effect of the crime and that its presence or involvement was not the result of coincidence." *United States v. Warwick*, 167 F.3d

965, 971 (6th Cir. 1999) (citing *Smith v. United States*, 508 U.S. 223, 238 (1993)) (emphasis added). "Thus, a conviction under § 924(c)(1) will withstand appellate review if the evidence is sufficient to support a finding that the defendant intended to have the firearm available for use during or immediately following the transaction, or if it facilitated the crime by emboldening the defendant." *Id.*

Pennington argues that the presence of his service weapon on his person when he entered Regina West's home was an example of the type of mere coincidence that should preclude a jury from returning a guilty verdict on a section 924(c)(1) charge. *See Warwick*, 167 F.3d at 971. He insists that he was in his full uniform, which included his service weapon, simply because he decided to make his ill-conceived detour to West's residence before reporting for duty at 5:00 a.m., and not because he needed to embolden himself by the weapon's proximity or because the weapon was essential for facilitation of the drug-trafficking offense.

In response, the government cites decisions from our sister circuits rejecting arguments that the presence of a firearm as part of an official law-enforcement uniform was simply coincidental to the commission of the offenses at issue in those cases. *See United States v. Rivera*, 889 F.2d 1029 (11th Cir. 1989), and *Guidry*, *supra*. In *Rivera*, co-defendant Sud, a police officer, argued that a departmental policy required him to carry a firearm with him at all times and that, as a result, his carrying of a firearm during the attempt by him and by his co-defendants to steal "either drugs or jewelry from the room of [a suspect]" was merely coincidental. *Rivera,* 889 F.2d at 1031 - 32. The Eleventh Circuit gave no credence to the argument, noting that "[t]wo days before the commission

of the offense, the defendants discussed the need to have weapons with them," testimony from which "a jury could reasonably conclude that the defendants were carrying firearms with the intent to use them if necessary during the offense." *Id.*

Likewise, the defendant in *Guidry* argued that, because he was a uniformed police officer, he was required to have his firearm with him. Thus, Guidry contended, the gun he was wearing in his belt when he raped the victim was there by coincidence; it was not carried "in relation to" the offense. *See Guidry*, 456 F.3d at 507-08. The Fifth Circuit did not agree with Guidry's view of the situation, however, and explained:

> Guidry did not take his gun out of his belt and actually threaten his victim, but he did keep his belt on such that Limon heard his gun banging against the side of the car while he was raping her. Guidry's gun remained holstered during the rape, but was always within his reach. A jury could reasonably conclude that Guidry was emboldened by his possession of the gun to rape Limon, and that the gun was a threat to and intimidated Limon.

*Id.* at 509.

The facts of Pennington's case present a substantively different situation. Although the presence of an armed, uniformed Kentucky state trooper in her home shortly before 4:00 a.m. clearly caused Regina West alarm, the reason for that panic almost certainly was *not* the fact that Pennington, upon entering the residence, immediately and casually handed West one of the pills containing a controlled substance that he had taken from her approximately 12 hours earlier. Instead, the only indication that can be culled from the trial transcript or from viewing the videotape

of the early-morning encounter between Pennington and West is that Pennington arrived at West's home in response to their "agreement" that Pennington would not arrest West on drug charges if she acquiesced to his sexual advances.

Even West's own trial testimony acknowledged the fact that the distribution of the hydrocodone pill was made without further comment and without an expectation of remuneration or further consideration. Rather, *after* that pill was given to West, she engaged in conversation with Pennington concerning the true purpose and import of the visit. Only after Pennington returned the pill did West ask him "what he wanted to do," and only then did the defendant respond with his crude suggestion for keeping her out of jail.

The "distribution" of the hydrocodone to West entailed no financial transaction and required no *quid pro quo* from West. Consequently, that act did not place Pennington in any danger, did not cause him fear, and was not furthered or facilitated by the carrying of his handgun. The service weapon, the official uniform, and the defendant's air of authority were, however, most definitely used to embolden Pennington and intimidate West into complying with his plan to extort sex in exchange for a promise to ignore his official responsibilities. Thus, Pennington carried a firearm during and in relation to a state offense involving extortion and exertion of improper influence. But, based upon the evidence presented at trial, no rational trier of fact could find beyond a reasonable doubt that Pennington carried the firearm in furtherance of the drug-trafficking offense charged in Count 2 of the indictment.

Under these circumstances, we conclude that the defendant's conviction on Count 3 of the indictment must be reversed for lack of legally sufficient evidence, that the sentencing order must be vacated, and that the matter must be remanded to the district court for resentencing on the remaining two counts. Given our disposition, we need not address the remaining issues on appeal.

## **CONCLUSION**

For the reasons set out above, we REVERSE the district court's judgment with regard to the defendant's conviction on Count 3 of the indictment, VACATE the sentencing order, and REMAND the case to the district court for resentencing.